**E-FILED**
Tuesday, 02 September, 2008 02:36:36 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

**FILED**

SEP - 2 2008

PAMELA E. ROBINSON, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**Kenneth W. Simmons**
**(Plaintiff)**

-v-

**Robert Stockstill**
**(Defendant)**

case no. 08 -cv- 1219

**Harold Stockstill**
**(Defendant)**

**JURY TRIAL**

**Mildred Stockstill**
**(Defendant)**

**TazewellCounty Deputy Ryan Tarby**
**(Defendant)( individual and official capacity)**

**T.C. Deputy Glover**
**(Defendant) ( individual and Official capacity)**

**Mackinaw P.D. Gary Hartzell**
**(Defendant) (individual and Official capacity)**

**Mackinaw P.D. Mark Skiles**
**(Defendant) (individual an Official capacity)**

**Village of Mackinaw Illinois**
**(Defendant)**

**County of Tazewell Illinois**
**(Defendant)**

**COMPLAINT**
**Having served the Defendants this complaint, waiver of service and notice of filing,**

On 6-25-08, Plaintiff was GRANTED summary judgment as to the 2000 truck, case no. 06-1153, upheld on review by Judge McDade on 8-28-08, the Plaintiff is awaiting Defendants Rule 68 offer in that case to date.

Now comes the Plaintiff, Kenneth Simmons of 12836 Appenzeller Rd. Mackinaw

Illinois 61755 309-359-8581, complaining of as well as testimony and evidence shows that the Defendants, conspired with each other, thier actions were in concert, Stockstills were acting as agents for the law enforcement officers and thier respective departments.
Defendant(s) fraudulently concealed information, whereabouts of evidence, 9-27-04 States Attorney mislead Plaintiffs counsel and Plaintiff by fraudulently concealing the location of the video and agents thereof (exhibit Q pg. 2), to unreasonably, search Plaintiffs vehicle(herein the truck) and seize Plaintiffs sign, and to seize unreasonably the named property of Plaintiff in that the Defendant(s) committed crimes against Plaintiffs property in violation ILCS, Defendant(s) concealed the damage.

The municipalities of Tazewell County and the Village of Mackinaw have a custom and/or policy of encouraging and allowing thier employess and/or agents thereof to violate the codes, laws, constitution and/or statutes of Illinois and the United States,statute of limitation tolled  due to fraudulent concealment in that on 6-16-04 Defendant M.Stockstill entered Plaintiffs vehicle and committed a vehicular burglary or theft, resisted arrest, and transfered ownership of the stolen merchandise to Harold Stockstill who transfered ownership to other Defendants who transfered ownership back to Stockstills, criminal defaced sign, Harold Stockstill on 6-16-04 asked Hartzell if he wanted the sign, verbally ( see video 17:59:34)located at 205 W. Fast ave, verbally Hartzell at the same location and time between 5:22 and 6:15pm answered verbally yes(17:59:34), actions were in concert with all Defendants and all Defendants intent was to deprive the Plaintiff permanetly and infact did of his personal property.

Deputy Glover fraudulent concealment located at 205 W. Fast Ave. Mackinaw II. 61755 on 6-16-04  (video17:50:28 thru 17:57;00) in that Deputy Glover falsely stated that he wanted to secure Plaintiffs weapon in Plaintiffs vehicle, Glovers intent was to provide the keys to Gary Hartzell (video17:57:00) to Plaintiffs vehicle, so the vehicle could be searched and seized, and Gary Hartzells fraudulent concealment located at 205 W, Fact ave. Mackinaw, II. 61755 between the hours of 5:22 pm and 6:15 pm on 6-16-04 in that Gary Hartzell falsely stated that Plaintiffs sign ( video 17:53:28) would be seized by law enforcement subject to Plaintiffs arrest and Plaintiff could recover the sign during criminal proceedings,( see Plaintiffs deposition exhibit A  pg.68 lines 12 to 18, page 75 lines 8 and 9) when in fact the Defendants gave and intent was to permanetly deprive Plaintiff of the sign by giving custody/allowed Defendants Stockstills to retain fraudulently what ALL THE DEFENDANTS KNEW was Plaintiffs sign and/or personal property.

Plaintiff was arrested on 6-16-04 for disorderly conduct, offensive sign, ONLY,( exhibit A) and  State of Illinois filed a charging instrument on 6-17-04 charging Plaintiff as indicated, (exhibit A) disorderly conduct is a class three misdemeanor, in which T.C. could issue notice to appear, Plaintiff requested a notice( see video 18:10:42) so that he could arrest M.Stockstill and retrieve personal property, Defendant Tarby denied this request, see video,( 18:10:42)

Plaintiff became aware that the Stockstill possessed the sign, not the other Defendants I believed had the sign as evidence, on 7-9-04.

Plaintiff became aware that Harold Stockstill defaced sign in November of 2004, S.A. fraudulently indicated to attorney and Plaintiff that Mackinaw P.D. had the video and pictures when in fact Tarby indicates it was entered into the Countys evidence on 6-17-04 and further as the State was WELL AWARE Mackinaw never took pictures or video, when the state provided pictures, THE STATE NEVER PROVIDED VIDEO UNTIL ORDER BY THIS COURT ON 1-4-08.

On 6-16-04 Defendant Hartzell, via Glovers fraudulent concealment, searched Plaintiffs truck, see affidavit provided in twenty days accompanying Plaintiffs first motion for summary judgment.

Plaintiff became aware that Hartzell searched Plaintiffs truck in January of 2008, Plaintiff had information available to him regarding the search 6-17-04 and 6-25-04, five years

from 6-17-04 is the statute of limitation.

All the Defendant knew the others actions were illegal and failed to stop the action or encouraged the action.

Robert Stockstill was a co-conspirator after the fact by filing a false police report on 6-18-04 to Detective Taylor indicating he had never abused his wife, mentally, physically, emotional, or verbally and further false by indicating he had never shot his childrens puppies to further the fraudulent disorderly conduct claims. Robert Stockstill fraudulently concealed that he abused Lori Stockstill and shot his puppies on 6-18-04 located at 101 S. Capitol Pekin Illinois at approx. 4:20 pm to Detective Taylor, the state of Illinois to further the fraud provided the statement to Plaintiff, in November, never interviewing Lori, Wayne or Sara Stockstill regarding the abuse of dogs or any physical abuse the children saw perpatrate against Lori or Lori herself, indicating they would pursue disorderly conduct charges.

Defendants actions were willful, wanton and intentional , it was readily apparent to any reasonable person that the Stockstills did not own the sign and that the sign was taken illegally in a vehiclular burglary /theft and that the Plaintiffs sole intent on 6-16-04 was to retain custody of his personal property and take Mildred Stockstill before a court of law for her criminal behavior, citizens arrest. It was clearly apparent that Mildred and Harold Stockstill resisted arrest and prosecution with the help of the other Defendants actions.

Evidence attached is a video and relevant sworn testimony and police reports.

## 1. Jurisdiction

1. Civil Rights act of 1871, Fourth Amendment of U.S Constitution, unreasonable search and seizure, 42 USC 1983 and 28 USC 1343(a)(4), 28 USC 1367 (a), 28 USC 1988 for damages or any jursdiction the Court determines or justice determines reasonable in the name of justice and equality to make plaintiff whole, common law tort.

2. At all times during the action there was in effect, Illinois Criminal Statutes, Illinois Rules of Criminal Procedure and Illinois Rights of Arrestee as well as the Illinois Constitution, 765 ILCS 103 Law Enforcement Disposition of property Act: 725 ILCS 5/103 Rights of Accused, sections 103-1(b) : 103-1(h), 725 ILCS 5/107 Arrest : 725 5/ 107.3, 725 ILCS 5/107-12 Notice to Appear : 725 ILCS 5/107-12 (d), 720 ILCS 5/19-1: a class two felony burglary, Public Act 095-0171, 720 ILCS 5/7.3 (a) Use of Force, 720 ILCS 5/19-1 Theft and control, 720 ILCS 5/21 damage and trespass to property, and 720 ILCS 5/108 search and seizure.

3. Soldal v Cook County.

4. At all material times the Plaintiff and Defendants either lived or were employed by the respective entities, and the actions took place in Tazewell County Illinois.

5. Defendants acted under scope of employment under color of law or as agents of.

## 2. Statement of counts/claims

1. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Ryan Tarby violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as a co-conspirator.

2. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Mark Skiles violated Plaintiffs right to be free from

unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as a co-conspirator.

3. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Gary Hartzell violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as co-conspirator.

4. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6:30pm, the Defendant Gary Hartzell violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, by fraudulently concealing the whereabouts of the sign.

5.On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6:30pm, the Defendant Gary Hartzell violated Plaintiffs right to be free from unreasonable search in that he searched Plaintiffs 2000 chevy s-10.

6.On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Deputy Glover violated Plaintiffs right to be free from unreasonable search by fraudulently concealing his intent when he requested Plaintiffs keys.

7. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Glover violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as co-conspirator.

8. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6:30pm, the Defendant Harold Stockstill as a agent for T.C. and Mackinaw violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as a co-conspirator.

9. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Harold Stockstill as a agent for T.C. and Mackinaw violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as a co-conspirator and fraudulently concealing the location of the sign.

10. On 6-16-04, located at 205 W. Fast Ave Mackinaw Illinois, between the hours of 5:22 pm and 6pm, the Defendant Mildred Stockstill as a agent for T.C. and Mackinaw violated Plaintiffs right to be free from unreasonable seizure by interfering with the Plaintiffs possesory interest in Plaintiffs personal property, a sign, as a co-conspirator.

11. On 6-16-04 Defendant Mildred Stockstill filed a false police report that she was offended by the sign and/or made false statements to police, to Hartzell, Tarby and Skiles at 205 W. fast ave. Mackinaw, fraudulently concealed until November 2004 by state.

12. On 6-18-04 Robert Stockstill co-conspired with Defendants and filed a false police report and/or made false statements to law enforcement, at the time and address indicated, see police report.

13. On 6-16-04 Harold Stockstill criminally defaced Plaintiffs personal property,

fraudulently concealed.

14. To further the interfere with Plaintiffs possesory interest in the sign  Defendant Tarby physically assaulted Plaintiff on 6-16-04. Plaintiff received medical treatment due to the assault. State of Illinois and Tarby, in concert, fraudulently concealed the video of the assault until 1-4-08 and Defendants actions. The States Attorneys office concealed the video physically from Plaintiff. Plaintiff requested copies from 6-17-04 until provided by Court ORDER on 1-4-08.

15. Common law claim that Hartzell violated ILCS by committing official misconduct, See People of the State of Illinois v Lynn Howard.

16. Common law claim that Tarby violated ILCS by committing official misconduct, See People of the State of Illinois v Lynn Howard.

17. Common law claim that Skiles violated ILCS by committing official misconduct, See People of the State of Illinois v Lynn Howard.

18.Common law claim that Glover violated ILCS by committing official misconduct, See People of the State of Illinois v Lynn Howard.

19. The actions of the Defendants caused the Plaintiff to feel, abused, mistreated, causing psychological, mental and emotional harm, annoyed, harassed, disturbed, distressed, concern, upset, fear, afraid, angry, ouraged,, felt defendants are a menace, and I feel threatened by the Defendants action, today.

20. Plaintiff fears parking his vehicle with his personal property in the vehicle in the County of Tazewell and Village of Mackinaw.

21. Plaintiff fears the Defendants.

## 3.   RELIEF REQUESTED

 one million dollars for the permanent loss of property, one million dollars per count compensatory and/or punitive damages, all costs related and/or emotional and/or mental damages all relief the Court/jury deems reasonable to make Plaintiff whole or as justice requires. Court Order the return of personal property if in original condition. An injunction preventing any further seizures by Tazewell County or Village of Mackinaw of any personal property of any citizen of the United States without a warrant in the future and give notice of  sanctions for violations of any Court ORDERS.

 THEREFORE, Plaintiff requests the costs, attorney fees etc. under 28 USC 1988, ILCS, common law tort and all the relief requested or as this Court deems reasonable, including amending the complaint, to make the Plaintiff WHOLE.

K.W. Simmons
Pro Se

Kenneth W. Simmons
12836 Appenzeller rd.
Mackinaw, Ill. 61755
309-359-8581

**E-FILED**
Tuesday, 02 September, 2008  02:36:44 PM
Clerk, U.S. District Court, ILCD

# Exhibit A

04-Cm-740

# IN THE TENTH JUDICIAL CIRCUIT COURT OF TAZEWELL COUNTY, ILLINOIS

**PEOPLE OF THE STATE OF ILLINOIS**

**BAIL BOND**

**_VS_**

Defendant _KENNETH SIMMONS_    D.O.B. _9/7/63_    Case No. _TMP25776_

Address _102830 APPENZELLER RD_ Charge(s) _DISORDERLY COND._

City, State, Zip _MACKINAW IL 61755_ Originating Department or Municipal No. _090_

The undersigned, as Defendant-Principal and surety, respectively, jointly and severally acknowledge themselves to be indebted to the People of the State of Illinois in the sum of $ _1000_, 10% to apply (to be levied upon their property, of whatever kind and wherever situated.) The undersigned Defendant, being charged with a statutory or ordinance violation, and now being admitted to bail in the aforesaid sum, undertakes the following conditions of bail pursuant to 725 ILCS 5/110-10 (a)

(1)   SAID DEFENDANT SHALL APPEAR on _JULY 20_, 20 _04_ at _9:00_ A.M./P.M. in Courtroom _104_

Tazewell County Courthouse, Pekin, Illinois for _ARG_ ;

and shall appear thereafter as ordered by the Court until discharged or final order of the Court;

(2)   Said Defendant shall submit to the orders and process of the Court;

(3)   Said Defendant shall NOT DEPART THIS STATE without leave of the Court;

(4)   Said Defendant shall GIVE WRITTEN NOTICE TO THE CLERK of the Court of any CHANGE OF ADDRESS within 24 hours of such change;

(5)   Said Defendant shall NOT VIOLATE ANY CRIMINAL STATUTE of any jurisdiction; and

(6)   Said Defendant shall have no contact with the following alleged victims_____

(7)   OTHER _$21.00 BOND FEE_

If said Defendant-Principal shall comply with the conditions of this bail above set forth, this bail shall continue in full effect. If any of the above conditions are violated by the Defendant, the said Defendant and surety shall be jointly and severally liable there on.

**FILED**

JUN 1 7 2004

As security for the performance of this agreement, the person charged, and/or the surety, has deposited the following:

A. ☑   10% BOND. The person charged has deposited, in cash, 10% of the amount of Bail as set forth above.

Amount of money deposited $ _100_ (Minimum $25.00)

_Pam Gardner_
TAZEWELL COUNTY CIRCUIT CLERK
TENTH JUDICIAL CIRCUIT OF ILLINOIS

Driver's license No. _____ deposited as additional bail (S. Ct. Rules 526-528)

B. ☐   FULL CASH BOND. (Must equal bail set)

C. ☐   REAL ESTATE BOND. (Separate sworn statement and schedule required.)

D. ☐   STOCKS, BONDS, SECURITIES: (Separate sworn statement and schedule required.) Approved _____

_____ Judge

E. ☐   RECOGNIZANCE BOND. Approved _____
                                        Judge

F. ☐   INDIVIDUAL BOND. Approved _____
                    Signature Designated Official          Identification

**NOTICE TO PERSON PROVIDING BAIL MONEY OTHER THAN DEFENDANT**
I hereby acknowledge that I have posted bail for the defendant named above. I further understand that if the defendant fails to comply with the conditions of this bail bond or any other case pending in this court, that the court shall enter an order declaring the bail to be forfeited, and if defendant is in compliance, said bail bond may nevertheless be used to pay costs, attorney fees, legal services reimbursement, fines or other purposes authorized by the court.

Signature _____

Name _LISA K SIMMONS_

Address _102836 Appenzeller Rd_

City/State/Zip _Mackinaw IL 61755_

**ASSIGNMENT OF BAIL BOND BY THE DEFENDANT**
I hereby authorize the return of the monies posted above to the person shown on this bail bond as having provided monies for my bail after all conditions of this bail bond have been met.
Signature of Defendant _____
Signed before me by the ( ) Defendant ( ) Assignee and security received.

_____                _____
Judge          Peace Officer          Circuit Clerk

Police Agency or Court _TCSO_      Date _6/16/04_

**CERTIFICATE OF DEFENDANT**
I, the Defendant named above, do hereby state that I know and understand the terms and conditions of this bail bond as shown on the FRONT AND REVERSE SIDES of this bail bond form. I understand further that if at any time prior to the final disposition of charge(s) I escape or am released on bond and fail to appear in court when required by the court, the result of my failure to appear will be as follows: I hereby waive my right to confront the witnesses against me, the trial can proceed in my absence; I forfeit the security money posted; judgement will be entered against me for the full amount of this bond, plus costs; a warrant may be issued, in which event additional bond money may be required. I understand and accept the terms and conditions set forth above and on the reverse side of this bail bond.

_____
Signature of Defendant

Phone # _309 - 635 - 7677_

Address _12836 Appenzeller Rd_

City _Mackinaw_

State _IL_      Zip _61755_

**E-FILED**
Tuesday, 02 September, 2008  02:36:51 PM
Clerk, U.S. District Court, ILCD

# Exhibit B

STATE OF ILLINOIS
COUNTY OF Tazewell County
The People of the State of Illinois

IN THE CIRCUIT COURT OF THE
TENTH JUDICIAL CIRCUIT

vs.

DEFENDANT:
**KENNETH W SIMMONS**
12836  APPENZELLER RD
MACKINAW, IL 61755-

Case#:     **2004CM000740**

# INFORMATION

COUNT 1    :The **STATE'S ATTORNEY** of Tazewell County, Illinois, in the name
and by the authority of the People of the State of Illinois charges that
**KENNETH W SIMMONS** on or about 16th day of June, 2004  at

**MACKINAW**,

in the County of Tazewell County, State of Illinois, committed the offense of

**OBSTRUCTING A PEACE OFFICER**

**IN THAT SAID DEFENDANT KNOWINGLY OBSTRUCTED THE PERFORMANCE OF RYAN TARBY AND GARY
HARTZELL OF AN AUTHORIZED ACT WITHIN THEIR OFFICIAL CAPACITY, BEING THE INVESTIGATION
OF A CRIMINAL DAMAGE COMPLAINT, KNOWING RYAN TARBY AND GARY HARTZELL TO BE A PEACE
OFFICERS ENGAGED IN THE EXECUTION OF HIS OFFICIAL DUTIES, IN THAT SAID DEFENDANT
REFUSED TO STAY AWAY FROM GARY HARTZELL AS GARY HARTZELL WAS ATTEMPTING TO INTERVIEW
A WITNESS,**

in violation of  720 ILCS 5/31-1(a)

A Class A Misdemeanor

The undersigned, on oath, states that the facts set forth in the foregoing
information are true in substance and matter of fact, to the best of his
knowledge, information and belief.

| | DESCRIPTION | |
|---|---|---|
| D.O.B. | SEX | RACE |
| | **Male** | **White** |

Additional ID

Hgt: 6 00    Wgt: 200    Hair: BRO    Eyes: BRO

SSN:                DLN:

Complainant
Subscribed and sworn to before me
**21st day of June, 2004**

Notary Public

Enhanced Penalty: **N**

Report Number: 200400979         Agency: **Tazewell County Sheriff's Office**
Report Number: 200400979         Agency: **Mackinaw PD**

**Filed**
06/21/2004 01:06:55 PM
PAM GARDNER
CIRCUIT CLERK

TAZEWELL COUNTY

**E-FILED**
Tuesday, 02 September, 2008  02:37:02 PM
Clerk, U.S. District Court, ILCD

# Exhibit C

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE CENTRAL DISTRICT OF ILLINOIS

3              PEORIA DIVISION

4

KENNETH SIMMONS,                    ORIGINAL

5

Plaintiff,

6

    vs.                    06 CV 1153

7

RYAN TARBY, GARY HARTZELL

8   and MARK SKILES,

9   Defendants.

10      THE DEPOSITION of KENNETH SIMMONS, called

11  as a witness by the Defendants in the above

12  entitled cause, taken before me, Deanna S.

13  Gabbert, CSR, License #084-002929, a Notary

14  Public in and for the County of Peoria and

15  State of Illinois, at 342 Court Street, in the

16  City of Pekin, County of Tazewell and State of

17  Illinois, on the 7th day of February, A.D.,

18  2008.

19

20

21

22

23

1

2

```
 1

 2        APPEARANCES:

 3        KENNETH SIMMONS,
                         Pro se
 4
          HEYL, ROYSTER, VOELKER & ALLEN
 5        124 SW Adams Street, Suite 600
          Peoria, IL 61602
 6        By:  John P. Heil, Jr., Esq.,
                   For Gary Hartzell
 7                 and Mark Skiles

 8        TAZEWELL COUNTY STATE'S ATTORNEY'S OFFICE
          324 Court Street, Room 110
 9        Pekin, IL 61554
          By:  Michael P. Holly, Esq.,
10                 For Ryan Tarby

11

12

13

14

15

16

17

18

19

20

21

22

23
```

9

1    Q.   I presume you have known Mildred and Harold

2         Stockstill for over 20 years as well, is that

3         correct?

4    A.   That is correct.

5    Q.   Other than their daughter, Lisa, do they have

6         any other children?

7    A.   Yes, they do.  They have two other children.

8    Q.   What are their names?

9              MR. SIMMONS:  I object as that is

10        irrelevant, but I will answer the question

11        anyways.

12             THE WITNESS:  They have a son, Robert

13        Stockstill, and they have another daughter,

14        Cheryl, and unfortunately, she is recently

15        married, and I do not know her last name.

16        BY MR. HEIL:

17   Q.   By recently --

18   A.   I haven't talked to that family in four years.

19   Q.   That actually brings up my next question.

20             Is it fair to say that your relationship

21        with the Stockstills right now is not very

22        good?

23   A.   That is a correct assumption.

```
 1   Q.   When did that relationship -- was there ever a
 2        good relationship between you and --
 3   A.   Oh, yeah.
 4   Q.   -- and the Stockstills?
 5   A.   Oh, yeah.
 6   Q.   If you can kind of explain how --
 7   A.   Easter 2004, it went downhill.
 8   Q.   What happened at that time?
 9   A.   My nephew told me that my brother-in-law was
10        shooting his dogs.
11   Q.   What's your nephew's name?
12   A.   Wayne Allen Stockstill.
13             MR. SIMMONS:  I object because he is a
14        minor.
15        BY MR. HEIL:
16   Q.   After Wayne Allen Stockstill told you that?
17   A.   He wasn't the only one that told me that.
18   Q.   Who else --
19   A.   Sara Lynn Stockstill as well.  She is a minor
20        as well.
21   Q.   Would that be your niece?
22   A.   Yes.
23   Q.   Whose children are they?
```

11

| 1 | A. | Robert's. |
| 2 | Q. | Does Robert have two children or more? |
| 3 | A. | Two. |
| 4 | Q. | And does -- is Robert married? |
| 5 | A. | Yes, he is. |
| 6 | Q. | What is his wife's name? |
| 7 | A. | Lori. |
| 8 | Q. | Is that L-o-r-i? |
| 9 | A. | Yes, sir. |
| 10 | Q. | You mentioned that Wayne and Sara are minors? |
| 11 | A. | Yes. |
| 12 | Q. | Do you know their approximate ages? |
| 13 | A. | Twelve and ten.  The boy, Wayne, is |
| 14 | | approximately 12, and the girl is, |
| 15 | | approximately, 10. |
| 16 | Q. | So they told you this over Easter 2004, is that |
| 17 | | correct? |
| 18 | A. | Correct. |
| 19 | Q. | Did that lead to your relationship with Robert |
| 20 | | going downhill? |
| 21 | A. | It began the descent, yes.  I had no |
| 22 | | communication, again, with them people until |
| 23 | | 6/16/04.  So between that time, there was no |

12

```
 1        communication between us.

 2   Q.   By no communication, do you mean no --

 3   A.   Nothing.

 4   Q.   -- face-to-face communication?

 5   A.   No. Nothing.

 6   Q.   That includes letters, phone calls?

 7   A.   Nothing.  Between Easter and 6/16/04, there was

 8        nothing.  I told my wife not to let them back

 9        in my house, even the children.

10   Q.   Where were you, actually, when they told you

11        that?

12   A.   At my house.

13   Q.   Was the rest of the family present as well?

14   A.   No, at the time, it was just me and the

15        children outside playing in the yard with my

16        dogs.

17   Q.   How many dogs do you have, sir?

18   A.   At the time, I had three dogs.

19   Q.   Was Robert and -- were Robert and Lori in

20        attendance in the house at that point?

21   A.   They were not present at all.

22   Q.   They weren't at your house?

23   A.   They were not at my house.  The only people
```

```
 1          present at my house was -- if I may go on?

 2    Q.    Please.

 3    A.    My wife and her sister, Cheryl, were in the

 4          house.   Cheryl brought the children.

 5    Q.    I see.   Did you ever confront Robert as to

 6          whether those allegations were true?

 7    A.    No, I did not.   I did not doubt those children.

 8    Q.    Is it fair to say, you didn't confront Mildred

 9          and Harold about --

10    A.    No, I did not.

11    Q.    And Lori as well?

12    A.    No, I did not.

13    Q.    Now, jumping forward a little bit to June 16,

14          2004, do you remember that day?

15    A.    Yes, I do.

16    Q.    Now, at that time, did you own a vehicle or

17          more than one vehicle?

18    A.    I owned numerous.   Yes, I did.

19    Q.    As of June 16, 2004, that's the only time frame

20          I'm really interested in, how many vehicles did

21          you own?

22    A.    Two -- three vehicles.

23    Q.    And what vehicles were they?
```

17

| | | |
|---|---|---|
| 1 | Q. | Was it your opinion as of June 16, 2004, that |
| 2 | | was actually the truth, what you put on that |
| 3 | | sign? |
| 4 | A. | Yes, I do.  I believe it today. |
| 5 | Q. | Why did you write that Robert Bob Stockstill |
| 6 | | beats Lori on that sign? |
| 7 | A. | Because I went into the house and took the kids |
| 8 | | out before when he abused her. |
| 9 | Q. | When was that? |
| 10 | A. | Approximately -- and I cannot be exact -- '99. |
| 11 | | Would you like to know the circumstances |
| 12 | | surrounding that? |
| 13 | Q. | Let me ask you one other question, if I could. |
| 14 | A. | Yes, sir. |
| 15 | Q. | At the time, were Robert Stockstill and Lori |
| 16 | | Stockstill married? |
| 17 | A. | Yes, they were. |
| 18 | Q. | How old were the children at that time? |
| 19 | A. | '99.  So they were little tykes -- four or |
| 20 | | five.  They were little bitty things. |
| 21 | Q. | Was this at their house? |
| 22 | A. | You are jumping ahead.  Could I tell you a |
| 23 | | story, and then you can ask me a question. |

18

```
 1  Q.  Go ahead, sir.
 2  A.  All right.  My wife and I lived at the time at
 3      138 Davis Lane in Mackinaw.  This was within
 4      village limits.  Lori Stockstill came to my
 5      trailer, very distraught, bruises up and down
 6      her arms.  Said Robert Stockstill was man
 7      handling her and would not let leave with the
 8      children.  I asked my wife what she wanted me
 9      to do, and she said, that's up to Lori.  Lori
10      said she wanted me to go get the children, and
11      I went in the house, and I got the children.  I
12      told him what would happen next time I heard
13      something about this.
14  Q.  When you got the children, was Robert
15      Stockstill home?
16  A.  Yes.  He was with the children.
17  Q.  What address did this take place at?
18  A.  I cannot tell you the specific number, but it
19      was on Orchard Avenue and Mackinaw.  I do not
20      know the house number.
21  Q.  Did you ever see Robert Stockstill abuse or
22      beat Lori Stockstill?
23  A.  Mentally, yes.  Emotionally, yes.  Never seen
```

```
 1        him physically touch her.
 2   Q.   Did you ever call the police?
 3   A.   No, I did not.  I told him what I would do to
 4        him next time it happened.
 5   Q.   What did you tell him you would do to him?
 6   A.   I would beat the hell out of him.
 7   Q.   After you took the children from the home, how
 8        long were the children and, I presume, Lori as
 9        well in your home?
10   A.   No.  Lori went back, and they tried to get over
11        it, basically.  I kept the children at my house
12        for at least overnight.  I don't know -- the
13        kids weren't in school.  So, you know, they
14        spent a lot of time -- I can't say when they
15        went back to their parents.  I know they were
16        overnight over that.  I know Lori went,
17        eventually, to her parents' house over that
18        incident.  I think she might have done it the
19        next day with the children.
20   Q.   Has there been any similar incidents like that
21        since 1999?
22   A.   Only, what I have heard from other people other
23        than Lori Stockstill, and I cannot recall any
```

```
 1         exact -- there was nothing exactly that I went
 2         over to him about.  You know what I mean?
 3         People said -- I would be down at Casey's where
 4         they worked, and people would say, you know, he
 5         is treating her like shit.  There was nothing.
 6         I wasn't around him.  I stayed away from these
 7         people as far as possible, because I knew what
 8         would happen if I was around them.
 9    Q.   Do you recall what year you actually moved out
10         of town to your present location?
11    A.   '99.
12    Q.   That was that same year?
13    A.   Yeah.
14    Q.   After that incident?
15    A.   Yeah.
16    Q.   Did that incident have anything to do with you
17         moving?
18    A.   No.  No.
19    Q.   So getting back to the sign you painted on
20         June 16, 2004, after you completed painting it,
21         what did you do with the sign?
22    A.   I put it in the back of my 2000 Chevy S-10,
23         secured it with a strap, so it would stay
```

45

```
 1        then he spoke to me directly.
 2   Q.   When he came out of the house, initially,
 3        did --
 4   A.   He did not come out of the house.  He came from
 5        the garage area as well.
 6   Q.   Was the garage door open, I presume?
 7   A.   It was until he left it.  He locked it up.
 8   Q.   He came out of the garage, closed the garage
 9        door and then --
10   A.   Left my sign in it, closed the garage door and
11        locked it.
12   Q.   After he told his wife, Mildred Stockstill, and
13        Lori to get in the house, did they leave your
14        presence at that point?
15   A.   They did.  He didn't.
16   Q.   You indicated that he then talked to you or
17        said something to you?
18   A.   He had started approaching me.
19   Q.   What happened then?
20   A.   I told him that he did not want to come near
21        me.  I told him he was not whipping on no old
22        lady today.  If he come toward me, there were
23        going to be consequences.
```

46

```
 1   Q.   What were you referring to?

 2   A.   He beats his wife as well.

 3   Q.   Have you ever seen that take place?

 4   A.   I have seen him mentally and emotionally abuse

 5        her.  I have never seen him physically abuse

 6        her.

 7   Q.   After you told him not to come any closer to

 8        you, what did he do?

 9   A.   He stopped.

10   Q.   At the time this was taking place, do you have

11        an idea how old Harold Stockstill is?

12   A.   If I can guesstimate, 62.  In that area.

13   Q.   After he stopped, what did Mr. Stockstill do

14        next?

15   A.   I believe that he told me to go home.

16   Q.   What happened next?

17   A.   I today him to give me my property back, and I

18        would be glad to go home.

19   Q.   Did he say anything in response to that?

20   A.   I believe he said, I'm calling the police.

21   Q.   What happened next?

22   A.   I said, I already called the police.  That's

23        who I was on the phone with when you guys were
```

47

```
 1        screaming.
 2   Q.   Did that conversation continue?
 3   A.   No.  I believe he left then that I can recall.
 4        There was no more confrontation.  He went in
 5        the house and we never -- I never seen him
 6        again after that as a matter of fact.
 7   Q.   Have you seen him around town at all since that
 8        time?
 9   A.   Since then, I have seen him.  I have seen him.
10        I have seen him all the time.  It's a
11        population of 1300.
12   Q.   Have you had conversations with him since that
13        day?
14   A.   No.  Never, no.
15   Q.   What about with Mildred?
16   A.   No.
17   Q.   I believe you already indicated that you
18        haven't with Lori either?
19   A.   I haven't talked to any of them.  I haven't
20        even talked to the children since that time.  I
21        see them though.  I see everybody, even the
22        children.
23   Q.   The police then arrived, correct?
```

52

```
 1   Q.   Where did that car park?

 2   A.   Behind my S-10.

 3   Q.   And did Chief Hartzell get out of that car?

 4   A.   Yes, he did.

 5   Q.   Did he approach you and Deputy Tarby as well?

 6   A.   Yes, he did.

 7   Q.   What happened at that time?

 8   A.   At this time, so Deputy Tarby goes, what do you

 9        want me to do?  I go, well, I wanted you to get

10        your ass up there and arrest these guys and get

11        my sign back.

12   Q.   Let me stop you right there for a moment, if I

13        could.

14             At that point, June 16, 2004, were you

15        familiar with Deputy Tarby?

16   A.   Yeah.

17   Q.   Had you had contacts was him previously?

18   A.   Yes.

19   Q.   Approximately, how many occasions?

20   A.   One that I can recall.

21   Q.   What was the nature of that contact?

22   A.   I was walking my dog on 800 acres.  I was on

23        the 400 acres across the street from my house.
```

57

| | | |
|---|---|---|
| 1 | Q. | What happened next? |
| 2 | A. | Chief Hartzell proceeded to tell Deputy Tarby |
| 3 | | who Robert Stockstill was.  Deputy Tarby had no |
| 4 | | idea at this point. |
| 5 | Q. | What did he tell him? |
| 6 | A. | Told him it was my brother-in-law. |
| 7 | Q. | What happened next? |
| 8 | A. | It was about this time that Chief Hartzell told |
| 9 | | me that it would be in the best interest of me |
| 10 | | to get in my truck and leave. |
| 11 | Q. | Did you do that? |
| 12 | A. | No, I did not. |
| 13 | Q. | Why not? |
| 14 | A. | I told him that would not happen unless I had |
| 15 | | my property back.  I said -- and then I will go |
| 16 | | down to the State's Attorney and deal with the |
| 17 | | charges of theft tomorrow, then. |
| 18 | Q. | Did Chief Hartzell at that point attempt to ask |
| 19 | | your wife some questions? |
| 20 | A. | Not immediately.  We all kind of stood there |
| 21 | | with a -- what I would say is a |
| 22 | | what-are-we-going-to-do-now look on our faces, |
| 23 | | and Chief Hartzell abruptly turned and |

59

| | | |
|---|---|---|
| 1 | | and to leave. |
| 2 | Q. | What happened next? |
| 3 | A. | I suddenly got -- it happened in a millisecond |
| 4 | | I got to Gary Hartzell, and I don't know if |
| 5 | | this was the second time or third time, but I |
| 6 | | told my wife, again, you do not have to talk to |
| 7 | | him.   Leave.   And before I knew it, Deputy |
| 8 | | Tarby had me by the right wrist. |
| 9 | Q. | When you were telling your wife she didn't have |
| 10 | | to talk to Chief Hartzell and she could leave, |
| 11 | | what tone of voice were you using? |
| 12 | A. | Demanding. |
| 13 | Q. | Did you care whether or not your wife talked to |
| 14 | | Chief Hartzell? |
| 15 | A. | Yes, I did. |
| 16 | Q. | Because I had a feeling it was going down the |
| 17 | | path that it went down. |
| 18 | A. | They told me to leave, and I wasn't going to |
| 19 | | leave. |
| 20 | Q. | You had a feeling that you were going to be |
| 21 | | arrested? |
| 22 | A. | Yeah. |
| 23 | Q. | Was that before you felt Deputy Tarby touch |

60

```
 1        your right wrist?
 2   A.   Yeah.  Yeah.  I did have a feeling that because
 3        I wasn't leaving without the sign.
 4   Q.   What happened next?
 5   A.   He arrested me.
 6   Q.   Now, it's my understanding, Mr. Simmons, that
 7        upon your arrest, you sat down in the street,
 8        is that correct?
 9   A.   No, I did not.
10   Q.   What did you do?  What physical action did you
11        take upon being arrested?
12   A.   I submitted to his command, walked back to the
13        vehicle with him.  At which time, he pushed me
14        against my will.  I told him I had a bad back.
15   Q.   Let me stop you right there.  You said you
16        walked back to the vehicle with him.
17            Which vehicle are you talking about?
18   A.   We left the driver's side of the S-15 and went
19        to the driver's side hood of the S-10.
20   Q.   You said he pushed you.  Who pushed you?
21   A.   Deputy Ryan Tarby pushed me in the back.
22   Q.   What happened then?
23   A.   I told him I have a bad back.
```

61

| | | |
|---|---|---|
| 1 | Q. | Was your back hurting you at that time? |
| 2 | A. | My back hurts constantly; but at that time, it |
| 3 | | was no more than normal. |
| 4 | Q. | What happened next? |
| 5 | A. | As if on cue, he pushed me over the hood of my |
| 6 | | truck. |
| 7 | Q. | Did you have handcuffs on at that time? |
| 8 | A. | No. |
| 9 | Q. | What happened next? |
| 10 | A. | As is the occasion, when my back goes into |
| 11 | | spasms, I lose feeling in my right leg, and I |
| 12 | | told him flat out, I have to sit down, or I'm |
| 13 | | going to fall down. |
| 14 | Q. | When did you first lose feeling in your right |
| 15 | | leg? |
| 16 | A. | Immediately when he pushed me over. |
| 17 | Q. | By over, are you referring to your torso going |
| 18 | | over the hood of your S-10? |
| 19 | A. | Correct. |
| 20 | Q. | And your feet were still on the ground at that |
| 21 | | time, correct? |
| 22 | A. | Yes. |
| 23 | Q. | What happened next? |

64

| | | |
|---|---|---|
| 1 | A. | I do not recall seeing Officer Skiles. |
| 2 | Q. | By that answer, do you mean at any point during |
| 3 | | this whole incident? |
| 4 | A. | I don't recall him at all. |
| 5 | Q. | As far as you know, you never had any |
| 6 | | communication with him? |
| 7 | A. | No. |
| 8 | Q. | Is that fair to say? |
| 9 | A. | No.  I never communicated with Mark Skiles at |
| 10 | | all. |
| 11 | Q. | Do you recall at -- approximately -- well, let |
| 12 | | me ask you this:  Is it fair to say that the |
| 13 | | ambulance transported you from there, being 205 |
| 14 | | Fast Avenue or thereabouts, at approximately |
| 15 | | 6:00 PM or so? |
| 16 | A. | Yeah, that would be approximate.  They took me |
| 17 | | against my will at that point. |
| 18 | Q. | If I understood you correctly, didn't you |
| 19 | | request an ambulance? |
| 20 | A. | I requested an ambulance to take me to my |
| 21 | | surgeon. |
| 22 | Q. | Where is your surgeon located? |
| 23 | A. | Methodist Hospital. |

65

| | | |
|---|---|---|
| 1 | Q. | And the ambulance took you to a different |
| 2 | | hospital? |
| 3 | A. | They took me to Pekin Memorial Hospital against |
| 4 | | my will. |
| 5 | Q. | What's your surgeon's name? |
| 6 | A. | Jesse Weinger, W-e-i-n-g-e-r. |
| 7 | Q. | Did you receive treatment at Pekin Memorial? |
| 8 | A. | Yes, I did.  I got shots in my spine -- two of |
| 9 | | them.  One was an anti-inflammatory.  The other |
| 10 | | was an antispasm, stop the spasms, and I was |
| 11 | | given two Vicodin. |
| 12 | Q. | Vicodin was for pain, I presume? |
| 13 | A. | Correct. |
| 14 | Q. | Did those two shots and those two Vicodin pills |
| 15 | | help you? |
| 16 | A. | Yes, they did.  Yes.  It's a system that I have |
| 17 | | had numerous times. |
| 18 | Q. | Are you asserting any damages from Pekin |
| 19 | | Memorial Hospital, what treatment they |
| 20 | | performed on you, in this lawsuit? |
| 21 | A. | Not in this lawsuit. |
| 22 | Q. | Are you filing suit against them otherwise? |
| 23 | A. | No. |

67

|  |  |  |
|---|---|---|
| 1 |  | that location? |
| 2 | A. | Yes, it was. |
| 3 | Q. | And prior to your departure from that location |
| 4 |  | to go to the hospital, did you ever see your |
| 5 |  | sign, again, after Mildred Stockstill took it |
| 6 |  | into her garage? |
| 7 | A. | No, I heard discussions about the sign. |
| 8 | Q. | Did not lay eyes on it, again? |
| 9 | A. | I have not seen the sign to this day. |
| 10 | Q. | Would it then be fair to say that you didn't |
| 11 |  | see any police officers, whether the three |
| 12 |  | defendants in this matter or any other police |
| 13 |  | officers, in physical contact of the sign? |
| 14 | A. | No, I never seen them in physical contact with |
| 15 |  | the sign. |
| 16 | Q. | You indicated that you heard in discussions |
| 17 |  | about the sign, is that correct? |
| 18 | A. | Yes. |
| 19 | Q. | Who was talking about the sign? |
| 20 | A. | Deputy Tarby and Chief Hartzell. |
| 21 | Q. | When did that take place? |
| 22 | A. | Well, they told me when I was laying on the |
| 23 |  | ground that they were taking it.  They were |

68

1      going to seize it as evidence.

2  Q.  Who said that?  You said they.

3  A.  Chief Hartzell and Ryan Tarby.

4  Q.  Were they talking to each other, or were they

5      talking to you?

6  A.  To me.

7  Q.  Do you recall who actually said that or if both

8      of them said it?

9  A.  Chief Hartzell said it.

10 Q.  What were the words he said as far as you can

11     remember?

12 A.  You don't have to worry about the sign.  You

13     will see the sign in court, or something to

14     that effect.  Like I said, that's four years

15     ago.  That's the gist of it.  They were taking

16     it because I didn't have to worry about it

17     going back to Stockstills is what I interpreted

18     it to mean.

19 Q.  You are aware -- at the time of your arrest on

20     June 16th, you were charged with obstructing a

21     peace officer, a misdemeanor, correct?

22 A.  No, not on June 16, I was not.

23 Q.  Were you charged with disorderly conduct?

69

| 1 | A. | Yes, I was, in that I made a sign that was |
| 2 | | offensive. |
| 3 | Q. | Just to followup on that point, I know it was |
| 4 | | jumping ahead, were you ever tried on the |
| 5 | | disorderly conduct? |
| 6 | A. | No. That charge was dismissed by the State's |
| 7 | | Attorney's office. |
| 8 | Q. | You were tried for a different charge, isn't |
| 9 | | that correct? |
| 10 | A. | I was tried for an incident that I was charged |
| 11 | | for on 6/21/04. |
| 12 | Q. | And was that the offense of obstructing a peace |
| 13 | | officer? |
| 14 | A. | Yes, it was. |
| 15 | Q. | Was that sign used as evidence in that criminal |
| 16 | | trial? |
| 17 | A. | No. |
| 18 | Q. | So you didn't actually see it in court, |
| 19 | | correct? |
| 20 | A. | No, I never have seen it again. |
| 21 | Q. | Would it be fair to say, Mr. Simmons, you don't |
| 22 | | know one way or another if that sign ever left |
| 23 | | the garage at 205 West Fast Avenue and went |

```
 1        into the custody of law enforcement?

 2   A.   That is not a fair assumption.

 3   Q.   Well, then, please enlighten me.

 4   A.   Two incidents I can speak of specifically.  One

 5        of them being that somehow that sign got out of

 6        the garage and into Ryan Tarby's possession for

 7        him to take a picture of.

 8   Q.   What picture are you referring to?

 9   A.   It was supplied by the defense, and I don't

10        know which document number it is.

11             MR. HEIL:  I think I do.  I will mark this

12        as Simmons Deposition Exhibit Number 2, if I

13        could, please.

14                       (Deposition Exhibit Number 2 was

15                        identified for the purpose of

16                        the record.)

17        BY MR. HEIL:

18   Q.   Mr. Simmons, I will show you what we marked as

19        Deposition Exhibit 2.  I know it's not a good

20        photocopy.

21             Is that a photocopy of the photograph you

22        are talking about?

23   A.   Yes, it is.
```

71

```
 1  Q.  And does that show your sign?

 2  A.  I cannot positively say that is my sign.  It is

 3      unreadable.

 4  Q.  Let me ask you about the shape of what appeared

 5      in -- appears in that black-and-white

 6      photocopy.

 7          Does that appear to be an odd shape -- not

 8      a square or rectangle?

 9  A.  Correct.

10  Q.  Was your sign this shape, that being sort of a

11      backward L shape?

12  A.  Similar, yes.  There are very close

13      similarities in the shape.

14  Q.  Now, looking toward the bottom of what I will

15      refer to as the sign in the photograph, is the

16      word "puppies" visible to you?

17  A.  It appears to be puppies.  It's hard to tell.

18      It does appear to say puppy.

19  Q.  You indicated earlier that you painted your

20      sign with black paint, is that correct?

21  A.  Yeah.

22  Q.  Does that appear to be black paint on the

23      photograph?
```

72

```
 1   A.   Yeah, if you look underneath of here in this
 2        one here.
 3   Q.   Okay.
 4             I just want to make sure.  You recall
 5        specifically using black paint, is that right?
 6   A.   Yes, to the best of my knowledge and belief, I
 7        think it was.
 8   Q.   Could it have been a different color?
 9   A.   No, it was black.  I believe it was black, but
10        now that you mention it though, I think the
11        black ran out.
12   Q.   Does it kind of look like there are at least
13        two colors on that sign?
14   A.   That's what it is looking like to me.  I think
15        at the end I did run out of black and I went
16        over it.
17   Q.   The word "puppies" I referred to earlier, looks
18        pretty bright as opposed to dark?
19   A.   Right.  I do remember running out now that I
20        think back on it.  I see there are two appears
21        to be, like I said, three and a half, four
22        years ago.
23   Q.   I understand.
```

73

| | | |
|---|---|---|
| 1 | A. | But it does resemble the shape. |
| 2 | Q. | You were meaning now a couple of minutes ago |
| 3 | | now that Ryan Tarby took a photograph of your |
| 4 | | sign, correct? |
| 5 | A. | That was the information that I obtained after |
| 6 | | the fact. |
| 7 | Q. | Because you never saw him do that? |
| 8 | A. | Never saw him do that. |
| 9 | Q. | Was there any other information you obtained |
| 10 | | about the whereabouts of the sign? |
| 11 | A. | Through testimony in a domestic hearing, yes, I |
| 12 | | did obtain information regarding this on |
| 13 | | July 9th of '04. |
| 14 | Q. | Was that hearing in Tazewell County? |
| 15 | A. | Yes, it was. |
| 16 | Q. | Was that in the Circuit Court in Tazewell |
| 17 | | County? |
| 18 | A. | Yes, it was. |
| 19 | Q. | Did that relate to a series of orders of |
| 20 | | protection? |
| 21 | A. | Yes, it did. |
| 22 | Q. | What was that testimony you were referring to? |
| 23 | A. | Harold Stockstill indicated under oath that he |

74

```
 1        still had the sign in his garage.
 2   Q.   So as far as you are concerned, Mr. Simmons,
 3        you don't know that the police ever took
 4        custody of it at any point, is that right?
 5   A.   Yes.  They demanded him, and I heard this, to
 6        get it out of the garage.  They wanted to see
 7        it.
 8   Q.   When did this take place?
 9   A.   While I was laying on the ground.  I heard -- I
10        was laying on the ground, and I heard somebody
11        say, do you need me, or something to the
12        effect, and that's when I looked up, and my
13        father-in-law had walked out to the side of the
14        house, and the officers -- it was a bunch of
15        them looked up at the house and said, we will
16        be right with you, or something like that, and
17        he goes, well, do you need this -- do you need
18        this?  And I assumed that he was talking about
19        the sign, but I never seen it.
20   Q.   Do you remember which police officers were in
21        this conversation?
22   A.   I can assure you that Tarby and Hartzell and, I
23        believe, Glover might have been there because
```

75

```
 1        he was all over the place.  He was all over the
 2        place.  He may or may not have been there.  I
 3        can't say for sure.
 4   Q.   Do you recall anything specific that Chief
 5        Hartzell said?
 6   A.   As far as?
 7   Q.   The sign.
 8   A.   Yeah, he told me he was taking the sign and I
 9        wasn't getting it back.
10   Q.   Other than that?
11   A.   Well, me and him had -- are you talking about
12        the conversation that we had on the ground?  I
13        don't know what you are referring to.
14   Q.   That was a bad question.  I apologize.
15             You indicated that Mr. Stockstill said
16        something about, do you need this, and your
17        assumption was he was talking about the sign,
18        is that correct?
19   A.   Right.
20   Q.   Did you hear Chief Hartzell say anything to him
21        in response to his question?
22   A.   I can't say specifically who said it, no.
23   Q.   Do you recall Deputy Tarby saying anything
```

| 1 | | specifically back to Mr. Stockstill? |
|---|---|---|
| 2 | A. | Not specifically. I can't recall that. No. |
| 3 | Q. | Now, after you went to the hospital, you went |
| 4 | | somewhere else, is that correct? |
| 5 | A. | To the pokey. Is that what you are getting at? |
| 6 | Q. | You went to the Tazewell County Jail, is that |
| 7 | | correct? |
| 8 | A. | Correct. |
| 9 | Q. | Do you recall what time you got there? |
| 10 | A. | No. I was drugged up big time. |
| 11 | Q. | You were released from Tazewell County Jail |
| 12 | | that evening, is that right? |
| 13 | A. | Yes. |
| 14 | Q. | Is it fair to say, it was about 9:55? |
| 15 | A. | Second or third shift said, that dude is yours, |
| 16 | | get him out of here before your shift is over. |
| 17 | | So it was right five minutes till. |
| 18 | Q. | Did someone post bond for you? |
| 19 | A. | Yes, my wife did. |
| 20 | Q. | What was the amount of the bond that had to be |
| 21 | | posted? |
| 22 | A. | $129, I believe. Something like that. As a |
| 23 | | matter of fact, if I had to redo that over, I |

```
 1   A.   Yes, I did.

 2   Q.   Where did you go?

 3   A.   I went to 205 West Fast to retrieve my truck.

 4   Q.   I assume since you didn't have a vehicle, you

 5        went with your wife?

 6   A.   Yes.

 7   Q.   Did she drive or did you --

 8   A.   No, I drove.

 9   Q.   How long did it take you to get to 205 West

10        Fast?

11   A.   A half an hour.

12   Q.   Was your vehicle there at that point?

13   A.   No, it was not.

14   Q.   What's the next thing you did?

15   A.   Well, I called dispatch and said, you guys

16        wouldn't happen to know where my truck is,

17        would you?

18   Q.   Did they tell you where your truck was?

19   A.   Yes, they did.

20   Q.   What did they inform you?

21   A.   They informed me my truck was at Midstate

22        Collision at Mackinaw.

23   Q.   How were you feeling physically at that point?
```

|   |     |                                                      |
|---|-----|------------------------------------------------------|
| 1 | A.  | About the law, yeah.                                 |
| 2 | Q.  | And you didn't agree with his interpretation of      |
| 3 |     | the law at that particular -- during that            |
| 4 |     | incident?                                            |
| 5 | A.  | Correct.                                             |
| 6 | Q.  | And when did that incident take place?               |
| 7 | A.  | I don't recall.                                      |
| 8 | Q.  | Would it be fair to say that this incident that      |
| 9 |     | took place on 205 West Fast, June 16, 2004,          |
| 10|     | that you were dissatisfied with the way things       |
| 11|     | turned out?                                          |
| 12| A.  | On 6/16/04?                                          |
| 13| Q.  | Correct.                                             |
| 14| A.  | Well, yeah.  I was dissatisfied.                     |
| 15| Q.  | Were you dissatisfied that the officers didn't       |
| 16|     | return your sign to you?                             |
| 17| A.  | No.  I was mad because they did not let me           |
| 18|     | retrieve my sign.  They did not let me arrest        |
| 19|     | the Stockstills.  They did not retrieve my           |
| 20|     | sign, and they did not arrest the Stockstills.       |
| 21| Q.  | You indicated to the officers that you wanted        |
| 22|     | them to retrieve the sign?                           |
| 23| A.  | And arrest her.                                      |

106

1   Q.   And they didn't do that?

2   A.   No.

3   Q.   And you were dissatisfied with that, correct?

4   A.   Correct.

5   Q.   So it would be fair to say that on the 16th of

6        June, you also disagreed with the officers'

7        interpretation of the law?

8   A.   I can't say that.

9   Q.   Specifically, Deputy Tarby, would it be fair to

10       say that you didn't agree with his

11       interpretation of the law that day?

12  A.   No, I can't say that.

13  Q.   You didn't agree with -- strike that.

14            You were upset that they didn't

15       immediately seek out and retrieve the sign?

16  A.   No, because once they told me they were going

17       to seize the sign, I knew where the sign was.

18  Q.   You indicated -- what officer was it that told

19       you that the sign would be seized?

20  A.   Gary Hartzell told me the sign would be seized.

21       We had quite a heated discussion about the sign

22       while I was laying on the ground.

23  Q.   Do you recall what it was exactly that he said?

1   A.   I asked him if he felt comfortable with what

2        was going on here, and he says, yes, I do.  I

3        go, you got to be shitting me, and he said, no.

4        You are going to jail.  I said, over a sign?  I

5        said, you better get the sign.  He said, we are

6        keeping the sign.  You will see it in court.  I

7        don't know if he said court or trial.  He said

8        I would see it in reference to this incident.

9   Q.   And the sign wasn't in his possession at that

10       time?

11  A.   No, it was not.

12  Q.   It was still in the possession of Mildred

13       Stockstill?

14  A.   I assume.

15  Q.   He didn't -- Chief Hartzell didn't specifically

16       say he was taking the sign as evidence, did he?

17  A.   Yes, he did.

18  Q.   In those words?

19  A.   He said he was taking the sign, yes.  Maybe not

20       in those words.  That is what I interpreted his

21       words at the time to mean.

22  Q.   You indicated that you were initially charged

23       with disorderly conduct from this incident,

108

```
 1        correct?
 2   A.   Correct.
 3   Q.   Were you actually charged with disorderly
 4        conduct or were you just arrested for that
 5        offense?
 6   A.   I was arrested for that offense.
 7   Q.   That was the offense you were booked into the
 8        Tazewell County Jail for?
 9   A.   Correct.
10   Q.   Ultimately, you were charged with the
11        obstructing a peace officer offense, correct?
12   A.   I was charged with obstructing a peace officer
13        on 6/21, I believe.
14   Q.   The charge was entered on that day?
15   A.   Yes.   That's when I became -- I did not become
16        aware of it until -- I became aware of -- that
17        I was charged with that.   I don't remember when
18        I became aware of that.   I was not formally
19        with that.   The charging instrument was filed
20        on the 21st, and I became aware in a court of
21        law on July 20th.
22   Q.   But that charge was stemming from the incident
23        at 205 West Fast on the 16th of June 2004,
```

113

```
 1        Tazewell County Jail, is that right?
 2   A.   Correct.  I would like to follow up on the last
 3        question, if I may.
 4   Q.   Sure.  Go ahead.
 5   A.   The date -- you asked if I knew that was the
 6        date.  From the information obtained from me
 7        through discovery -- that I obtained through
 8        discovery would indicate that Ryan Tarby took
 9        pictures of the sign on that day in his police
10        report.
11   Q.   By that date, what date do you mean?
12   A.   6/16/04.
13   Q.   But you don't know whether this photo was
14        specifically taken that day or not?
15   A.   No, I do not.  If I may, though, it was
16        provided.  These pictures were provided to me
17        by the State's Attorney, I'm wanting to say, in
18        November of 2004, and they indicated to me, the
19        State's Attorney, that these are pictures that
20        were tooken on 6/16/04, and I believe that was
21        Anna Rossi.
22   Q.   Now, if we could go back to the part where you
23        were released from the hospital.
```

119

```
 1   A.   Yes.

 2   Q.   Were the windows rolled up?

 3   A.   Yes.

 4   Q.   Were the doors locked?

 5   A.   Yes.

 6   Q.   Did you request a receipt for your property

 7        seized?

 8   A.   Yes.

 9   Q.   Did you ever, including and up to today,

10        receive a receipt from any law enforcement

11        officer for the property seized on 6/16/04,

12        particularly a sign or Chevy S-10 2000?

13   A.   No.

14   Q.   At any time on 6/16/04, did you request that

15        Mildred Stockstill be arrested for trespass to

16        your motor vehicle and theft of your property?

17   A.   Yes.

18   Q.   Did Mildred Stockstill injure your vehicle?

19   A.   Yes.

20   Q.   Did Mildred Stockstill take your property?

21   A.   Yes.

22   Q.   Did you give law enforcement officers

23        permission to have custody, control or
```

1        possession of your sign other than to be used

2        in the rest of Mildred Stockstill's --

3  A.   No, I did not give them permission to have it

4        for any other reason other than to prosecute

5        Mildred Stockstill. That's the end of my --

6             MR. HEIL: This concludes the deposition

7        of Kenneth Simmons.

8             Mr. Simmons, you have the right at

9        this time either to review the transcript that

10       the court reporter is going to prepare for

11       errors and then you can -- not anything

12       substantive, if anything is spelled wrong,

13       something like that, or you can waive that

14       privilege.

15            THE WITNESS: That gives me like 30 days,

16       right?

17            MR. HEIL: Correct.

18            THE WITNESS: I would like to review.

19            MR. HEIL: You are reserving --

20            MR. SIMMONS: I'm reserving the right to

21       review.

22            FURTHER DEPONENT SAYETH NOT.

23

1    STATE OF ILLINOIS

2                                SS

3    COUNTY OF PEORIA

4              C E R T I F I C A T E

5        I, Deanna S. Gabbert, CSR, License

6    #084-002929, a Notary Public duly commissioned

7    and qualified in and for the County of Peoria

8    and State of Illinois, DO HEREBY CERTIFY that,

9    pursuant to notice, there came before me on the

10   7th day of February, A.D., 2008, at 342 Court

11   Street, Pekin, Illinois, the following named

12   person, to wit:

13

14                  KENNETH SIMMONS,

15   called by the defendants who was by me first

16   duly sworn to testify to the truth and nothing

17   but the truth of his knowledge touching and

18   concerning the matters in controversy in this

19   cause and that he was thereupon carefully

20   examined upon his oath, and his examination

21   immediately reduced to shorthand by means of

22   stenotype by me.

23       I ALSO CERTIFY that the deposition is a

122

1    true record of the testimony given by the

2    witness, that the reading and signing of the

3    deposition by the said witness were expressly

4    reserved.

5        I FURTHER CERTIFY that I am neither

6    attorney or counsel for, nor related to or

7    employed by, any of the parties to the action

8    in which this deposition is taken, and,

9    further, that I am not a relative or employee

10    of any attorney or counsel employed by the

·11    parties hereto, or financially interested in

12    the action.

13        IN WITNESS WHEREOF, I have hereunto set my

14    hand at Peoria, Illinois, this 13th day of

15    February, A.D., 2008.

16

                        s/ Deanna S. Gabbert
17

18

19                    Certified Shorthand Reporter

20

21

22

23

**E-FILED**
Tuesday, 02 September, 2008  02:37:11 PM
Clerk, U.S. District Court, ILCD

# Exhibit D

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                    PEORIA DIVISION

 4                                    ORIGINAL
          KENNETE SIMMONS,

 5
          Plaintiff,

 6
               vs.                    06 CV 1153

 7
          RYAN TARBY, GARY HARTZELL
 8        and MARK SKILES,

 9        Defendants.

10           THE DEPOSITION of LISA SIMMONS, called as a

11       witness by the Defendants in the above entitled

12       cause, taken before me, Deanna S. Gabbert, CSR,

13       License #084-002929, a Notary Public in and for

14       the County of Peoria and State of Illinois, at

15       342 Court Street, in the City of Pekin, County

16       of Tazewell and State of Illinois, on the 7th

17       day of February, A.D., 2008.

18

19

20

21

22

23
```

36

| | | |
|---|---|---|
| 1 | | was? |
| 2 | A. | I don't. I don't recall. |
| 3 | Q. | Was it an employee of the City of Mackinaw or |
| 4 | | Tazewell County Sheriff's Department? |
| 5 | A. | I don't recall who showed first. |
| 6 | Q. | Is there a reason that you stayed in the |
| 7 | | vehicle? Why didn't you get out of the |
| 8 | | vehicle? |
| 9 | A. | I just -- I didn't. I just stayed in the |
| 10 | | vehicle. |
| 11 | Q. | There isn't any particular reason? |
| 12 | A. | No. |
| 13 | Q. | Did you -- did you speak with any of the police |
| 14 | | that were there? |
| 15 | A. | Gary Hartzell. |
| 16 | Q. | Well, the first officer, you indicated that you |
| 17 | | don't know who it was? |
| 18 | A. | Right. I don't know who showed up first. |
| 19 | Q. | You don't know what department the first person |
| 20 | | to show up was? |
| 21 | A. | I don't know. It was probably Tazewell County, |
| 22 | | but I don't recall. |
| 23 | Q. | If you don't know, it's okay. |

```
 1              MR. SIMMONS:  You keep badgering her until
 2      you get an answer.
 3              THE WITNESS:  I don't know if Hartzell was
 4      already there.  I know I turned my truck around
 5      and parked it; and as far as I know that the
 6      Tazewell County was parked in front of me, and
 7      I was talking to Gary Hartzell.
 8      BY MR. HOLLY:
 9   Q.  So basically officers did arrive on the scene?
10   A.  Correct.
11   Q.  More than one officer was there?
12   A.  Correct.
13   Q.  And do you know --
14   A.  Although, Hartzell wasn't in uniform.
15   Q.  Do you know how many officers were there total?
16   A.  No.
17   Q.  You indicated that Gary Hartzell was one of the
18      officers that responded, correct?
19   A.  Correct.
20   Q.  Did you know any of the other officers that
21      responded?
22   A.  No.
23   Q.  Did you at any point become aware of who the
```

38

```
 1        officers were that responded?

 2   A.   Not that day, no.

 3   Q.   Did you at any point become aware?

 4   A.   You mean what their names were?

 5   Q.   Correct.

 6   A.   Not that I recall.

 7   Q.   Did any of the officers that arrived on the

 8        scene make an attempt to speak with you?

 9   A.   Gary Hartzell.

10   Q.   Did you speak with him?

11   A.   Yes.

12   Q.   What did he ask you, if anything?

13   A.   He asked me what was going on.

14   Q.   And did you respond to him?

15   A.   Yes.  I told him freedom of speech, and he said

16        he knew it was going to cause problems, and I

17        told him, no comment, and then he said, well,

18        look where it got him, got him arrested; and at

19        that time, I heard Kenny going, my back, my

20        back, I told you I had a bad back.  And I

21        looked at Gary, and I told him, I said, he does

22        have a bad back, and Gary walked away.  I

23        turned on my blinker.  Looked for traffic and
```

38

| | | |
|---|---|---|
| 1 | | officers were that responded? |
| 2 | A. | Not that day, no. |
| 3 | Q. | Did you at any point become aware? |
| 4 | A. | You mean what their names were? |
| 5 | Q. | Correct. |
| 6 | A. | Not that I recall. |
| 7 | Q. | Did any of the officers that arrived on the |
| 8 | | scene make an attempt to speak with you? |
| 9 | A. | Gary Hartzell. |
| 10 | Q. | Did you speak with him? |
| 11 | A. | Yes. |
| 12 | Q. | What did he ask you, if anything? |
| 13 | A. | He asked me what was going on. |
| 14 | Q. | And did you respond to him? |
| 15 | A. | Yes. I told him freedom of speech, and he said |
| 16 | | he knew it was going to cause problems, and I |
| 17 | | told him, no comment, and then he said, well, |
| 18 | | look where it got him, got him arrested; and at |
| 19 | | that time, I heard Kenny going, my back, my |
| 20 | | back, I told you I had a bad back. And I |
| 21 | | looked at Gary, and I told him, I said, he does |
| 22 | | have a bad back, and Gary walked away. I |
| 23 | | turned on my blinker. Looked for traffic and |

```
 1           MR. SIMMONS:  You are badgering the
 2      witness, sir.  I'd ask you not do that.  She
 3      answered your question to the best of her
 4      ability.  You are not going to get her to
 5      change her mind by badgering her.
 6           MR. HOLLY:  I'm just trying to make sure
 7      that I have a clear understanding of everything
 8      that happened, sir.
 9           MR. SIMMONS:  You can read the transcript
10      later because she just testified.
11      BY MR. HOLLY:
12  Q.  Did you observe your husband get arrested?
13  A.  No.
14  Q.  You didn't see --
15  A.  (The witness shook her head.)
16  Q.  -- how that happened?
17  A.  (The witness shook her head.)
18  Q.  You didn't see him taken into custody?
19  A.  No.
20           MR. SIMMONS:  She told you no twice now.
21           MR. HOLLY:  I'm asking different
22      questions, sir.
23           THE WITNESS:  He was behind me.  I didn't
```

41

```
 1          look.  Gary was right here.

 2          BY MR. HOLLY:

 3    Q.    So you don't know the reason your husband was

 4          arrested?

 5    A.    I know what I bailed him for.

 6    Q.    But at that time, you didn't know what he was

 7          under arrest for?

 8    A.    No.

 9    Q.    After your -- during your conversation with

10          Mr. Hartzell, did you hear anything that was

11          going on with any other officers and your

12          husband?

13    A.    No.

14    Q.    Did your husband at any time indicate to you

15          that you didn't need to speak with

16          Mr. Hartzell?

17    A.    I don't recall.

18    Q.    Did he indicate to you that you should leave

19          the scene?

20    A.    I don't recall.  Like I said, at that time I

21          was just on Gary.

22    Q.    After your conversation with Mr. Hartzell, you

23          drove away?
```

42

|   |    |                                                        |
|---|----|--------------------------------------------------------|
| 1 | A. | Correct.                                               |
| 2 | Q. | And you said that you went to go get bond, is          |
| 3 |    | that right?                                            |
| 4 | A. | Correct.                                               |
| 5 | Q. | Because at that point, you had become aware            |
| 6 |    | that your husband was under arrest?                    |
| 7 | A. | Because Gary Hartzell told me, look where it           |
| 8 |    | got him, it got him arrested.                          |
| 9 | Q. | Where what got him?                                    |
| 10| A. | You tell me. That's what he said to me.                |
| 11| Q. | He didn't indicate in your conversation?               |
| 12| A. | No.                                                    |
| 13| Q. | When you left the scene, where did you go after        |
| 14|    | that?                                                  |
| 15| A. | I went to a friend's mom's house because Ken           |
| 16|    | had the phone and called him to come to be with        |
| 17|    | me, and then I went home to get the checkbook          |
| 18|    | to get money.                                          |
| 19| Q. | You went to a friend's house first?                    |
| 20| A. | Friend's mom's. To use her phone to call him.          |
| 21| Q. | To call your husband?                                  |
| 22| A. | No. To call her son. He doesn't live with             |
| 23|    | her.                                                   |

```
 1        somebody else back behind the thing, and they
 2        were talking.
 3   Q.   Do you ever recall your husband coming closer
 4        to your location?
 5   A.   I don't recall.  Like I said, I was on Gary
 6        Hartzell.
 7·  Q.   Did you see anyone actually place your husband
 8        into custody?
 9   A.   No.
10   Q.   Just so I understand, it's your view then that
11        you left that area in your SUV on your own
12        accord, not as a result of any prompting from
13        your husband?
14   A.   Correct.  From Chief Hartzell telling me he was
15        arrested.
16   Q.   You aware of an officer by the name of Mark
17        Skiles?
18   A.   Correct.
19   Q.   How are you aware of him?
20   A.   He was Mackinaw police at the time.
21   Q.   Did you see him out at that location that day?
22   A.   No.
23   Q.   Would the time of about five minutes to 10 at
```

```
 1        night be a fair estimation of when you believe

 2        your husband was released from Tazewell County

 3        Jail?

 4   A.   Around 10:00, I would say, yes.

 5   Q.   Do you, as you sit here today, know whether or

 6        not that sign is still at your parents' house?

 7   A.   I don't know.  I can assume.  That's it.  I

 8        don't know.

 9             MR. HEIL:  I don't have any further

10        questions.

11        EXAMINATION BY MR. SIMMONS:

12   Q.   I'd like to ask her a couple of questions, if I

13        may.

14             Did you give Mildred Stockstill permission

15        to possess, control or have custody of the sign

16        that's the subject of this lawsuit?

17   A.   No.

18   Q.   Did the plaintiff have sole custody, possession

19        and control over the sign, the subject of this

20        lawsuit, or the vehicle that is the subject of

21        this lawsuit?

22   A.   Yes.

23   Q.   Did you give Ryan Tarby, Gary Hartzell or Mark
```

```
 1        Skiles permission to have possession, custody

 2        or control over the sign or vehicle that are

 3        now the subject of this lawsuit?

 4  A.    No.

 5  Q.    Did you attend any hearings or trial-related

 6        hearings related to the arrest for disorderly

 7        conduct?

 8  A.    No.

 9  Q.    At any time, did your niece or nephew tell you

10        that their father had shot their dogs?

11  A.    Yes.

12  Q.    What day would that be on?

13  A.    Easter day.

14             MR. SIMMONS:  That's it.

15             MR. HEIL:  Ms. Simmons, I should tell you

16        at this point, you do have the right to review

17        the transcript as it is typed up.

18             THE WITNESS:  I would like to, please.

19             MR. HOLLY:  Thank you.

20

21

22             FURTHER DEPONENT SAYETH NOT

23
```

```
 1     STATE OF ILLINOIS

 2                         SS

 3     COUNTY OF PEORIA

 4              C E R T I F I C A T E

 5         I, Deanna S. Gabbert, CSR, License

 6     #084-002929, a Notary Public duly commissioned

 7     and qualified in and for the County of Peoria

 8     and State of Illinois, DO HEREBY CERTIFY that,

 9     pursuant to notice, there came before me on the

10     7th day of February, A.D., 2008, at 342 Court

11     Street, Pekin, Illinois, the following named

12     person, to wit:

13

14                  LISA SIMMONS,

15     called by the defendants who was by me first

16     duly sworn to testify to the truth and nothing

17     but the truth of her knowledge touching and

18     concerning the matters in controversy in this

19     cause and that she was thereupon carefully

20     examined upon her oath, and her examination

21     immediately reduced to shorthand by means of

22     stenotype by me.

23         I ALSO CERTIFY that the deposition is a
```

63

1    true record of the testimony given by the

2    witness, that the reading and signing of the

3    deposition by the said witness were expressly

4    reserved.

5        I FURTHER CERTIFY that I am neither

6    attorney or counsel for, nor related to or

7    employed by, any of the parties to the action

8    in which this deposition is taken, and,

9    further, that I am not a relative or employee

10    of any attorney or counsel employed by the

11    parties hereto, or financially interested in

12    the action.

13        IN WITNESS WHEREOF, I have hereunto set my

14    hand at Peoria, Illinois, this 13th day of

15    February, A.D., 2008.

16

17

18    _____

19                    Certified Shorthand Reporter

20

21

22

23

**E-FILED**
Tuesday, 02 September, 2008  02:37:19 PM
Clerk, U.S. District Court, ILCD

# Exhibit E

TIME OF CALL
WAS 5:22 AM

RD #04-293

CASE NO. MAC #

**MACKINAW
POLICE DEPARTMENT**
100 E. East Avenue
Mackinaw, Illinois 61755
Phone: 1-800-322-0166

**REPORT OF TOWED VEHICLES**

DATE OF TOW: 06-16-04     TIME OF TOW: Approx 6:30 PM

LOCATION TOWED FROM: 205 West EAST AVE

LOCATION TOWED TO: MIDState Collision Repair

TOWED BY: Pete OWNER

REASON OF TOWING: Because OWNER ARRESTED

NAME OF OFFICER AUTHORIZING TOWING: M. SKILES   8163

DESCRIPTION OF VEHICLE TOWED

    YEAR:

    MAKE: CHEVY

    MODEL: S-10 pick-up

    COLOR: BROWN IN color Buje

    V.IN.: 1GCCS1952482447920

    LIC. #: 7480 XC

DATE: 06-16-04

OFFICER: ▉▉▉▉▉▉  8163

    s/ Mark Skiles

P1991
M-0007

**RECEIVED**
JUN 2 3 2004

**E-FILED**
Tuesday, 02 September, 2008  02:37:27 PM
Clerk, U.S. District Court, ILCD

# Exhibit F

IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

TAZEWELL COUNTY, ILLINOIS

| | | |
|---|---|---|
| ROBERT STOCKSTILL vs. LISA SIMMONS | ) ) | 04-OP-325 |
| HAROLD STOCKSTILL vs. KENNETH SIMMONS | ) ) | 04-OP-326 |
| ROBERT STOCKSTILL vs. KENNETH SIMMONS | ) ) | 04-OP-327 |
| HAROLD STOCKSTILL vs. LISA STOCKSTILL SIMMONS | ) ) | 04-OP-328 |

REPORT OF PROCEEDINGS of the hearing had before the **HONORABLE KEVIN R. GALLEY,** Judge of said Court, on the **9th** day of **JULY**, A.D., **2004.**

APPEARANCES:            **MR. KIRK W. BODE**
Attorney at Law
Pekin, IL 61554
            **FOR THE PETITIONERS**

**RESPONDENTS APPEAR PRO SE**

Proceedings electronically recorded and transcribed
by **Donna M. Lee,** C.S.R. 084-000786
Official Court Reporter of the Tenth
Judicial Circuit, State of Illinois.

PG. 1

## <u>CONTENTS</u>

<u>Page Number</u>

**I**    Introduction                                             **2**

**II**   Petitioners' Evidence

    **1. Harold Stockstill**
    Direct Examination by Mr. Bode           **6**
    Cross-Examination by Mr. Simmons        **13**
    Cross-Examination by Ms. Simmons        **16**

    **2. Mildred Stockstill**
    Direct Examination by Mr. Bode          **18**

    **3. Robert Stockstill**
    Direct Examination by Mr. Bode          **20**

    **4. Gary Hartzell**
    Direct Examination by Mr. Bode          **23**

                **Petitioners Rest**   **26**

**III**  Mr. Bode's Argument                         **27**

**IV**   Court's Ruling                               **27**

Pb. 2



| 1 | Q | ████████████ |
| 2 | A | █████████████████████ |
| 3 | Q | ██████████████████████ |
| 4 | | ████████████████ |
| 5 | A | ████████████ |
| 6 | Q | █████████████████████ |
| 7 | A | ███ |
| 8 | Q | ████████████████████████ |
| 9 | | █████████████ |
| 10 | A | ████ |
| 11 | Q | ████████████████████████ |
| 12 | | ███ |
| 13 | A | ██████████████████████ |
| 14 | | ████████████████████████ |
| 15 | | ██████████████████████ |
| 16 | | ██████ |
| 17 | Q | Had you seen this sign before that day? |
| 18 | A | No. |
| 19 | Q | Have you seen that sign since that day? |
| 20 | A | Yes, it's still in my garage. |
| 21 | Q | ████████████████ |
| 22 | A | ████ |
| 23 | Q | ████ |
| 24 | A | ████████████████ |

PG. 2

**E-FILED**
Tuesday, 02 September, 2008  02:37:36 PM
Clerk, U.S. District Court, ILCD

# Exhibit G



NARRATIVE (Cont) ARRIVED ON SCENE, DEPUTY THREAY WAS ALREADY ON SCENE,

TALKING TO #1 SIMMONS. #1 SIMMONS WAS COMPLAINING OF #2 STOCKSTILL

TAKING A SIGN OUT OF THE BACK OF HIS TRUCK THAT WAS PARKED IN

FRONT OF 205 W. FIRST AVE. #1 SIMMONS WAS SHOUTING AT DEPUTY THREAY

ABOUT SCRATCHES ON THE TAILGATE OF HIS TRUCK, CAUSED BY STOCKSTILL,

WHEN SITE TOOK THIS SIGN. THIS OFFICER (HARTZELL) ADVISED SIMMONS TO

"PUT THIS SIGN DOWN, AND EXPLAIN WHAT THIS SIGN WAS. SIMMONS STATED,

"NO, I WON'T KEEP MY VOICE DOWN, AND THE SIGN SAID, ASK ME BOB ROBERT

STOCKSTILL BEATS LORI & SHOOTS PUPPIES." THIS OFFICER ASKED SIMMONS,

"WHY DID YOU PUT THIS SIGN IN FRONT OF THEIR HOUSE?" SIMMONS STATED,

"BECAUSE HE DOES." THIS OFFICER THEN WENT TO A CAR A FEW FEET

AWAY, WHERE #1 SIMMONS WIFE WAS SITTING. AS THIS OFFICER

APPROACHED TO TALK TO #1 SIMMONS WIFE, #1 SIMMONS YELLED TO THIS WIFE,

"DON'T SAY ANYTHING YOU DON'T HAVE TO SAY ANYTHING TO HIM, JUST GO HOME!"

THIS OFFICER ASKED MRS. SIMMONS, "WHAT IN THE WORLD IS GOING ON HERE?"

#1 SIMMONS THEN STARTED ADVANCING TOWARDS THIS OFFICER WHILE YELLING

AT HIS WIFE TO LEAVE. THIS OFFICER ADVISED #1 SIMMONS, "JUST GO BACK TO

YOUR TRUCK, I JUST WANT TO TALK TO HER FOR A MINUTE." #1 SIMMONS

CONTINUED TO APPROACH THIS OFFICER, YELLING. AT THAT TIME, DEPUTY

OAKLEY TOOK #1 SIMMONS BY THE WRIST, AND TOLD HIM TO RETURN TO HIS

TRUCK. AT THIS TIME, SIMMONS BEGAN TO PULL AWAY FROM DEPUTY THREAY,

P1991
M-0005

PAGE ( 3 ) of ( 3 ) PAGES

s/ G. Hartzell

TIME, DATE, DAY OF INFL.

DISPATCHING NO.
044-04

P1991
M-0006

RECEIVED
JUN 3 8 2004

NARRATIVE (Cont)

DEPUTY TARLBY THEN PUT #1 SIMMONS ARM BEHIND HIS BACK AND D. STARTED
TO PUT CUFFS ON. AT THIS POINT MRS. SIMMONS STATED " I HAVE NO
COMMENT". AND SPOKE AWAY. AFTER BEING PLACED UNDER ARREST,
#1 SIMMONS THEN BEGAN SPRAWLS ABOUT, HAVING A BAD BACK AND FELL
TO THE GROUND NEXT TO HIS TRUCK. DEPUTY TARLBY AND THIS OFFICER
THEN HELPED #1 SIMMONS UP OFF THE STREET AND SAT HIM DOWN IN
THE GRASS NEXT TO HIS TRUCK. MACKINAW RESCUE WAS CALLED, WHILE
WAITING FOR RESCUE TO ARRIVE, SIMMONS ROLLED AROUND IN THE GRASS,
VOICING ABOUT HIS BACK HURTING AND HIS LEG GOING NUMB.
RESCUE ARRIVED, OFFICER SKILES ADVISED (MACKINAW P.D.) DEPUTY SNYDER. ARRIVED.
SIMMONS WAS TRANSPORTED, OFFICER SKILES BEGAN GETTING WRITTEN STATEMENTS
AND #1 SIMMONS TRUCK WAS TOWED FROM SCENE.
SEE DEPUTY TARLBY REPORT, AND OFFICER SKILES REPORT.

E-FILED
Tuesday, 02 September, 2008  02:37:44 PM
Clerk, U.S. District Court, ILCD

# Exhibit I

## T    well County Incident Report    )400979

Date: 06/17/2004 12:19                                                    Page: 3    of 4

### Incident Narrative 1 06/16/2004 21:55

### Reporting DEPUTY RYAN TARBY - TCSO, ID # 6251

ON 06-16-04, AT APPROX 1732 HOURS, MACKINAW POLICE CHIEF HARTZELL, DEPUTY GLOVER, AND I (DEPUTY TARB'
WERE DISPATCHED TO 235 W. FAST AVE , MACKINAW IN REFERENCE TO A STALLED VEHICLE AND SOMEONE
DAMAGING THE VEHICLE WHERE IT WAS BROKE DOWN.

UPON ARRIVAL, I MADE CONTACT WITH THE COMPLAINANT, KENNETH SIMMONS. CHIEF HARTZELL ARRIVED ON
SCENE TO ASSIST. KENNETH SAID HIS 2000 CHEVROLET S-10 HAD BROKEN DOWN IN FRONT OF 235 W. FAST,
MACKINAW. KENNETH SAID HE HAD A SIGN IN THE BACK OF THE TRUCK THAT HAD BEEN REMOVED BY THE
OCCUPANTS OF 235 W. FAST AVE. KENNETH SAID THE SUBJECT(S) DAMAGED HIS TRUCK BY LEAVING SMALL
SCRATCHES ON THE INSIDE TAILGATE FROM THE SIGN BEING DRUG ACROSS. I OBSERVED SEVERAL SMALL
SCRATCHES ALL OVER THE TAILGATE AS WELL AS ON THE SIDES OF THE BED OF THE TRUCK. I ASKED KENNETH HO'
DID HE KNOW WHICH SCRATCHES WERE FROM THE SIGN BEING REMOVED AND WHAT WAS ALREADY THERE SINCE
THERE WERE SO MANY (APPARENT OLD DAMAGE). KENNETH SAID "WELL ASK THEM, THEY OUGHT TO KNOW......I
WANT THEM TO PAY FOR THE SCRATCHES THEY DID.". I ASKED KENNETH WHAT THE SIGN HAD WRITTEN ON IT AND
HE SAID IT SAID BOB BEATS HIS WIFE AND SHOOTS PUPPIES. KENNETH SAID HE JUST SO HAPPENED TO BREAK DOWN
IN FRON OF BOB'S PARENTS HOUSE. I ASKED KENNETH IF THE VEHICLE STARTED UP NOW. KENNETH THEN
RETRACTED HIS STATEMENT AND SAID THAT HIS TRUCK WAS JUST SPUTTERING AND WASNT RUNNING WELL. I
ASKED KENNETH AGAIN THAT IT JUST HAPPENED TO BREAK DOWN IN FRONT OF THAT HOUSE. KENNETH SAID YES
AND DEMANDED HE GOT HIS SIGN BACK. I ASKED KENNETH TO GET INTO THE TRUCK AND SEE IF THE TRUCK WOULI
RUN. KENNETH SAID HE WASNT GETTING INTO THE TRUCK BECAUSE HE HAD BEEN DRINKING.

CHIEF HARTZELL WENT TO THE VEHICLE THAT WAS PARKED DIRECTLY IN FRONT OF KENNETH'S TRUCK. KENNETH'
WIFE WAS IN THE DRIVERS SEAT. CHIEF HARTZELL WENT TO THE VEHICLE TO SEE WHAT INFORMATION SHE MAY
HAVE. KENNETH BECAME UPSET AND STARTED YELLING AT HER NOT TO TALK TO CHIEF HARTZELL. KENNETH
STARTED WALKING TOWARDS CHIEF HARTZELL WHILE HE WAS YELLING. I ADVISED KENNETH TO COME BACK TO
MY LOCATION SO CHIEF HARTZELL COULD CONTINUE TO INVESTIGATE. KENNETH TURNED AROUND AND LOOKED A
ME AND CONTINUED TO WALK TOWARDS CHIEF HARTZELL. I AGAIN ADVISED KENNETH TO COME BACK TO THE REA
OF THE VEHICLE. KENNETH REFUSED AND KEPT TELLING HIS WIFE TO LEAVE AND NOT TO TALK TO THE US. I
GRABBED A HOLD OF KENNETH'S ARM TO PULL HIM AWAY. KENNETH TENSED UP HIS ARM. I PLACED KENNETH IN A
WRIST CONTROL HOLD AND ESCORTED HIM TO THE FRONT OF HIS TRUCK. I ADVISED KENNETH HE WAS UNDER
ARREST FOR OBSTRUCTING OUR INVESTIGATION AND REFUSING TO COMPLY WITH MY INSTRUCTIONS. KENNETH WA
PLACED IN HANDCUFFS. KENNETH IMMEDIATELY BEGAN TO COMPLAIN HE HAD BACK PAINS AND STARTED TO
SLUMP TOWARDS THE GROUND. KENNETH SAID HE WANTED MEDICAL ATTENTION. KENNETH LAID ON THE STREET
NEXT TO HIS TRUCK AND COMPLAINED ABOUT HIS BACK. MACKINAW RESCUE WAS CALLED FOR MEDICAL
EVALUATION. KENNETH ADVISED HE WANTED TO GO TO METHODIST HOSPITAL. I ADVISED MACKINAW RESCUE TO
TRANSPORT TO PEKIN MEMORIAL HOSPITAL FOR MEDICAL TREATMENT.

I LOOKED AT THE SIGN AND OBSERVED YELLOW AND BLACK SPRAY PAINT OVER LETTERING. THE SIGN WAS MADE
OF PLYWOOD. THE LETTERING SAID "ASK ME! BOB "ROBERT" STOCK-STILL BEATS LORI AND SHOOTS PUPPIES.".
OFFICER SKILES ADVISED ME THE MAN IN THE HOUSE ADMITTED TO SPRAY PAINTING OVER THE LETTERING SO THAT
ROBERT WOULDNT SEE THE MESSAGE AND GET UPSET. THE MALE WAS AFRAID ROBERT WOULD GO AFTER KENNETH
IF HE READ THE MESSAGE. PHOTOGRAPHS WERE TAKEN OF THE SIGN.

MACKINAW RESCUE TRANSPORTED KENNETH TO THE PMH EMERGENCY ROOM. KENNETH WAS EVALUATED AND
RELEASED BY THE HOSPITAL.

KENNETH WAS TRANSPORTED TO THE TAZEWELL COUNTY SHERIFFS DEPARTMENT AND RELEASED TO THE
CORRECTIONAL OFFICERS FOR BOOKING AND PROCESSING.

KENNETH WAS CHARGED WITH OBSTRUCTING A PEACE OFFICER FOR FAILING TO COMPLY WITH THE INSTRUCTIONS
I WAS GIVING HIM TO STEP AWAY FROM CHIEF HARTZELL (FOR SAFETY REASONS AS WELL AS LETTING HIM CONDUC1
AN INVESTIGATION.) KENNETH WAS ALSO CHARGED WITH DISORDERLY CONDUCT FOR PLACING THE SIGN IN HIS
TRUCK CAUSING PERSON(S) TO BE OFFENDED. KENNETH WAS VERY LOUD BEFORE THE TIME OF ARREST AND HAD TO
BE ADVISED BY CHIEF HARTZELL TO LOWER HIS VOICE SO HE WOULDNT BE CAUSING A SCENE. KENNETH ALSO LEFT
A THREATENING PHONE MESSAGE WHICH IS DESCRIBED IN THE FOLLOWING PARAGRAGH.

P1991
M-0013

T · well County Incident Report · 1400979

Date: 06/17/2004 12:19                                                                  Page: 4      of 4

MACKINAW OFFICER SKILES MADE CONTACT WITH THE OCCUPANTS OF LORI STOCKSTILL WHO SAID SHE SAW
KENNETH DRIVE BY WITH HIS WIFE 2 TIMES AND BOTH TIMES YELLED AT LORI AND HE MOTHER-IN-LAW TO LOOK A
THE SIGN IN THE BACK OF HIS TRUCK. LORI SAID MILDRED GOT TO THE TRUCK AND READ IT. LORI SAID MILDRED
TOOK THE SIGN FROM THE TRUCK AND TOOK IT TO THE GARAGE. LORI SAID KENNETH CAME BACK AROUND AND
DEMANDED THE SIGN BACK AS WELL AS ACCUSING THEM OF CAUSING DAMAGE BY SCRATHCING THE TRUCK. LORI
SAID 2 OTHER WOMEN WALKED BY AND READ THE SIGN. LORI SAID THEY WENT INSIDE THE HOUSE AFTER A COUPL
OF MINUTES. LORI ADVISED OFFICER SKILES THAT SHE ALSO HAS A MESSAGE ON HER ANSWERING MACHINE FROM
KENNETH SAYING "ROBERT, IM GOING TO COMB OVER THERE AND KICK YOUR FAT ASS.". LORI ADVISED THE
MESSAGE HAD TO BE LEFT SOMETIME BETWEEN 1530 HOURS AND 1730 HOURS ON 06-16-04. LORI WAS ADVISED TO
HOLD ONTO THE TAPE IN CASE THE STATES ATTORNEYS OFFICE WOULD WANT TO REVIEW IT.

P1991
M-0014

**E-FILED**
Tuesday, 02 September, 2008  02:37:52 PM
Clerk, U.S. District Court, ILCD

# Exhibit J

VOLUNTARY STATEMENT
(NOT UNDER ARREST)

PAGE NO. 1 OF 1 PAG

I, ▓▓▓▓▓▓▓▓▓▓▓ s/ Mildred M. Stockstill ▓▓▓▓▓▓▓▓▓▓, am not under arrest for, nor am I being detained for any crimi-
nal offenses concerning the events I am about to make known to Mackinaw Police Dept.

Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following infor-
mation of my own free will, for whatever purposes it may serve.

I am 42 years of age, and I live at ▓▓▓▓▓▓▓▓▓▓▓ , Mackinaw, IL ▓▓▓▓▓

The Lori and I were looking at clothes in back of
car and yelled something about his truck we just
went on looking at clothes and then came around
again and yelled look at sign. I read it and
took it out of truck and put it in garage. I
yelled jail bird + wish you weren't my daughter.
Harold sprayed sign and told them to get
their rifles and leave.
  Shirey Meyers + Chris Zarr said they
didn't see the sign till they yelled look at
sign. I did say to them I wish he was
my X son in law and sorry she was my
daughter.
  Harold told us to get in house and
shut the door and say nothing else to them. Which
we did. Lori and grandkids left for ball game

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections,
any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at 4/16/04 , this 16 day of June 2004

WITNESS ▓▓▓▓▓▓▓▓▓▓▓

WITNESS s/ Mark Skiles

Signature of person giving voluntary statement
s/ Mildred M. Stockstill
P1991
M-0008

RECEIVED
JUN 23 2004

FORM B-180    LAW ENFORCEMENT SYSTEMS P.O. BOX 1885 CORSICANA, TEXAS 75140
ORDER FROM

**E-FILED**
Tuesday, 02 September, 2008  02:38:01 PM
Clerk, U.S. District Court, ILCD

# Exhibit K

**VOLUNTARY STATEMENT**
(NOT UNDER ARREST)

PAGE NO.____ OF___ PAG

I, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ am not under arrest for; nor am I being detained for any crimi
s/ Lori Stockstill
offenses concerning the events I am about to make known to Mackinaw Police Dept
Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following infor
mation of my own free will, for whatever purposes it may serve.

I am 31 years of age, and I live at ▬▬▬▬▬▬▬▬▬▬▬  Mackinaw Il ▬▬▬

I (Lori) was showing mother-in-law (Mildred)
Some thing in my car, when Kenny Simmo
+ wife (Lisa) drove by screaming something
from car. I looked at Mildred asked her
what they said. Then Kenny + Lisa
drove by again and screamed look at
my sign. Mildred got to the
truck before me (Lori) and took sign
down and took it to her garage. Kenny
said give me the sign back and that
Mildred scratched his truck.
And 2 other women were walking
by and read it too. I didn't get
to read it til I got to garage.
We stood in yard for about 3 mins.
and went in to house.

I have read each page of this statement consisting of _____ page(s), each page of which bears my signature, and corrections, if
any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at Mackinaw Police Dept this 16 day of June 2004
WITNESS: ▬▬▬▬▬▬▬  8165  ▬▬▬▬▬▬▬
WITNESS: ▬▬▬▬▬▬  s/ Mark Skiles          s/ Lori Stockstill
                                            signature of person giving voluntary statement
                                                    P1991
                                                    M-0009        **RECEIVED**

FORM B - 160     LAW ENFORCEMENT SYSTEMS, P. O. BOX 1835 CORSICANA, TEXAS 75110    JUN 23 2004
                              ORDER FROM

**E-FILED**
Tuesday, 02 September, 2008  02:38:09 PM
Clerk, U.S. District Court, ILCD

# Exhibit L

VOLUNTARY STATEMENT
(NOT UNDER ARREST)

PAGE NO. _1_ OF _1_ PAG

I, ████████ s/ Christine Zehr ████████, am not under arrest for, nor am I being detained for any crimi-

offenses concerning the events I am about to make known to _MACKINAW POLICE DEPT._

Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following infor-
mation of my own free will, for whatever purposes it may serve.

I am **43** years of age, and I live at ████████ _Mackinaw, Il._

I was walking in front of the residence of
Harold & Mildred Stockstill, a red S.U.V. drove
by and the man in the passenger seat said
something about a nice sign. Mildred & I saw
Stockstill came out front from the back yard.
There was a plywood sign in the back
of a small truck stating "Robert "Bob"
Stockstill beats Laurie & kills puppies"
Mildred took the sign off the back of the
tailgate. The red suv came back down the
road. The male occupant got out of the vehicle
and started shouting profanities and told
her not to touch his truck. Mildred had
already taken the sign off. He was becoming
more hostile & belligerent at that point I
started walking for home.

I have read each page of this statement consisting of _1_ page(s), each page of which bears my signature, and corrections,
any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at _201 W. East Ave._, this _17th_ day of _June_ _2004_

WITNESS: ████████

WITNESS: ████████
s/ Gary L. Hartzell

Signature of person giving voluntary statement
s/ Christine A. Zehr

P1991
M-0010

**E-FILED**
Tuesday, 02 September, 2008  02:38:18 PM
Clerk, U.S. District Court, ILCD

# Exhibit M

STOCKSTILL, Mildred M.

Simmons, Kenneth W

STOCKSTILL, Lori, S.

Zehr, Christine

SEE All Att STATEMENTS

SEE Narrative

SEE Narrative down to Report.

SEE Photos

I didn't need any trouble from him at all.

In drive at 205 W East Ave at 1st.

Sign SEE Photos

V. and 3-4

NONE At This Time

GCC517521924779010

City St.

Buy — Time.

SS-1211 RM.

M. Skiles       Deputy Thesler

8863

I. Madison

Madison

MacEwen

MacEwen

200 Block W. East

205 W East Ave at 1st

City St.

P1991
M-0001

RECEIVED
JUN 2004

s/ Mark Skiles        s/ Hartzell   s/ Glover

| NO. | CHARGE | ARREST CHARGES CHAPTER | SECTION | SUB-SECTION | COMMUNICATIONS |
|---|---|---|---|---|---|

| 2 | Disorderly Conduct | 720 ILCS 5/26-1a1 | | | |

SEE CHARGES County Deputy has against him.

| Arrest Date | Arresting Ofc. | I.D. No. | Arrest Loc. | Arrest Time | Code |
|---|---|---|---|---|---|
| 06-16-04 | Deputy Tansey | N/A | 205 W East | Approx 5:35 am | |

IL0901100

P1991
M-0002

AGENCY ID NO.

RECEIVED
JUN 2 3 2004

NARRATIVE: I rec skills on 06-16-04 at Approx 5:40 pm was coming on duty when I heard Dispatch giving a call 2 chief Hartzell and 2 Deputys at 205 W.

First one I advise Skills arrived on scene and spoke to Mackinaw 1 chief Hartzell about what was going on Deputy Tansey at this point already had # 2 Kenneth in Custody for obstructing the office. I

Rio Skills spoke with Deputy Tansey who stated that # 2 needed to be seen by Rescue because he stated his back was hurt. I rec skills first up to 205 W East ave and asked # 1 mildred what had happened

She stated herself and Lori was outside in driveway looking at some items in the Trunk of # 3's car when # 2 drove by and yelled something and then drove off Approx couple of mins later # 2 came back and yelled look at the Sign so I # 1 went out to the Truck were # 2 had a sign in the back of his truck that stated (BOB, Robert Stockstill) Boats Lori +

shoots puppies, I # 1 at this point crabbed the Sign from the back of the truck and took it to the garage area see Apt. statement this her # 2 husband told her to go into the house #25 was still yelling shot give me back that sign, and you Smith my truck sold # 1 Her Lori into

PAGE ( 3 ) of ( 3 ) PAGES

| | 8/6-3 | 6-16-04 Wed. | RDH | 04-293 | MHC #044 |

NARRATIVE (Cont) the house #2 yelled out Zan Collins the Police at this
2 other Females were walking by #4 attentive and another long
see #4's ATT. statement. At this point Deputy Treasy went to
Robin's House to call to wait for #2 to be Released from Custody of Doctor
and taken to County jail see Deputy Treasy's report I e/o Stein
took all booking Statements and will try to speak with other and
to #2's vehicle was towed from the scene by Midstate Collision.
He Safety, not to leave at vit sit. would have Released to #2's
wife but she didn't want to talk to pd. police because her
husband #2 told her not to. the P/he I e/o Stein got this
point went to back into scene.

RECEIVED
JUN 23 2004

P1991
M-0003

**E-FILED**
Tuesday, 02 September, 2008  02:38:26 PM
Clerk, U.S. District Court, ILCD

# Exhibit N

| Date: 11/10/2005 13:33:32 | **PEKIN HOSPITAL** | Page 1 of 1 |
| | 600 S 13TH STREET | |
| | PEKIN, IL 615544969 | |
| | Phone #: (309 ) 347 -1151 | |
| | Federal ID: 370692351 | |

| PATIENT NAME | FACILITY | VISIT ID | FC | BIRTH DATE | ADMIT DATE | DISCH. DATE |
|---|---|---|---|---|---|---|
| SIMMONS, KENNETH W | 01 | 0005073091-0001 | C | 09/07/1963 | 06/16/2004 | 06/16/2004 |

TO:    SIMMONS, KENNETH W
12836 APPENZELLER
MACKINAW, IL 61755

|  | | SERVICE FROM | SERVICE THRU |
|---|---|---|---|
| | | 06/16/2004 | 06/16/2004 |

TYPE          E    EMERGENCY CENTER O/P
ATTEND PHY 00732    HILLMAN, BETH M

| Primary Insurance | Secondary Insurance | Tertiary Insurance |
|---|---|---|
| AETNA | | |

P.O.BOX 26053
GREENSBORO, NC 27420

▮▮▮▮▮

60749912548

| CHARGE CODE | SERVICE DATE | CHARGE DESCRIPTION | CPT4 | QTY | PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 352785 IF040616HM | 06/16/2004 | NORFLEX INJ. 30MG. 2ML. | | 1 | 76.50 | 76.50 |
| 352839 IF040616HM | 06/16/2004 | TORADOL 60 MG INJ | | 1 | 15.30 | 15.30 |
| 356065 IF040616HM | 06/16/2004 | VICODIN TABLET (BANCAP-HC/ZYDONE) | | 2 | 2.00 | 4.00 |
| 356065 IF040616HM | 06/16/2004 | VICODIN TABLET (BANCAP-HC/ZYDONE) | | -2 | 2.00 | -4.00 |
| 356065 IF040616HM | 06/16/2004 | VICODIN TABLET (BANCAP-HC/ZYDONE) | | 2 | 2.00 | 4.00 |
| | | 250 PHARMACY | | 4 | | 95.80 |
| 051631 IF040616HM | 06/16/2004 | ICE COLLAR DISP. | | 1 | 0.00 | 0.00 |
| | | 279 OTHER SUPPLIES | | 1 | | 0.00 |
| 070202 PH0_Other | 06/16/2004 | CLASS II EXPRESS CARE 24 LEVEL II ER | 99282 | 1 | 110.00 | 110.00 |
| 073140 PH0_Other | 06/16/2004 | INJECTION SUBQ OR IM | 90782 | 2 | 128.00 | 256.00 |
| | | 450 EMERG ROOM | | 3 | | 366.00 |
| 079204 PH0_Other | 06/16/2004 | EMERGENCY CENTER PHYSICIAN FEE - III | 99283 | 1 | 226.00 | 226.00 |
| | | 981 PRO FEE/ER | | 1 | | 226.00 |
| CT2545 072004 L2 | 07/20/2004 | AETNA PAYMENT     L | | 1 | 0.00 | 0.00 |
| | | Z01 PAYMENTS | | 1 | | 0.00 |

TOTAL CHARGES    687.80

RECEIVED
11-15-05
Kws

INS PAYMENTS/ADJUSTMENTS        0.00

* * * * INVOICE TOTAL        687.80

**E-FILED**
Tuesday, 02 September, 2008  02:38:34 PM
Clerk, U.S. District Court, ILCD

# Exhibit O

Date: 06/21/2004 09:49                                                                           Page: 1    of 1

### Incident Narrative 3    06/18/2004    17:12

### Supplemental Reporting DETECTIVE CLYDE TAYLOR - TCSO, ID # 6222

On Friday, 06/18/04, at about 4:20pm Robert Stockstill came to the Sheriff's Department requesting to see a Detective and I (Det. C.L. Taylor, *6222) met with him.

Robert had in his possession a Panasonic MC60 microcassette audio tape. Robert said it contained threats and harassment from his brother-in-law Kenneth Simmons. Kenneth is married to Robert's sister Lisa. The threatening, harassing messages were originally left on the digital answering machine at Robert's home, 13625 Zimmerly Road, Mackinaw. Robert copied the messages from his digital answering machine onto side A of the microcassette tape, but the messages are also still on his digital machine.

Robert explained there was an incident in front of his parents house on Wednesday 06/16/04 and Kenneth was arrested. Roberts parents are Harold and Mildred Stockstill who live at 205 W. Fast in Mackinaw. Kenneth had parked a truck in front of Robert's parents house with a sign that said Robert beats his wife and shoots puppies. Kenneth called the police after Robert's Mother removed the sign from the truck. When the police arrived, Kenneth was arrested although Robert didn' know what the charge was.

I asked Robert what prompted Kenneth to make the sign. Robert said he doesn't know because he has never struck or beat his wife and has never shot any dogs. Robert's parents have talked with friends in town who came by to read the sign because Kenneth was driving around in a Chevy Blazer yelling and telling people to go read the sign in front of their house. Robert estimated the sign, which is plywood, measures approximately four foot by four foot. Robert said Kenneth also went to Tazewell County Animal Control a couple months ago and told them that he shoots his pit bulls in the ass with a BB gun. Robert said someone from T.C.A.C. spoke with his wife but he doesn't know if there is any documentation about it.

I reviewed Deputy Tarby's report about the incident with the sign and the arrest of Kenneth Simmons on 06/16/04. For the record Deputy Tarby's narrative indicates the address where the truck was parked is 235 W. Fast but it is actually 205 W. Fast according to Robert.

I listened to the microcassette tape. On the first call, the first few words are not clear, but this is the rest; "and you can take this to the police or whoever, I'm gonna beat your fat fuckin ass, I'm gonna beat your fat fuckin ass, this is your brother-in-law Kenny Simmons, you got my word on it, I'm gonna beat your fat fuckin ass, any motherfucker that'll beat fuckin his wife and shoot his dog, I'm gonna shoot beat your fat fuckin ass fat boy, take to the bank Bob".

On the second call the answering machine says, "Tuesday 1202pm". The message is; "Hey you might want to check out the fuckin sign I made on my truck it's at the corner of Fast Street and Main, you may want to check it out, if anything happens to my truck I've notified the police, just make sure to check, to uh, state your name there Robert, have a good day".

Robert obtained an order of protection (04-OP-237) against Kenneth today. I advised Robert I would keep the microcassette tape for now, and I would forward a copy of the report to the State's Attorney's Office.

After Robert left, I made contact with Deputy Tarby who was on duty, and requested that he stop by Robert's house to listen to the original messages on the digital machine to confirm the source of the microcassette tape.

**E-FILED**
Tuesday, 02 September, 2008  02:38:42 PM
Clerk, U.S. District Court, ILCD

# Exhibit P

# Tazewell County Incident Narrative Report - 210002260

Date:  06/20/2004 11:20

Page: 1     of 1

**Incident Narrative 2**     **06/17/2004**   **15:17**

**Supplemental Reporting DEPUTY RYAN TARBY - TCSO, ID # 6251**

On 06-17-04, at approx 1530 hours, photographs of the truck and sign were logged with the report. The video tape of the arrest was logged into evidence.

**E-FILED**
Tuesday, 02 September, 2008  02:38:50 PM
Clerk, U.S. District Court, ILCD

# Exhibit Q

*JOHN F. LEUCK*
*ATTORNEY AT LAW*
*406 Court Street*
*Pekin, Illinois 61554*
*(309) 353-6046*
**FAX (309) 347-6347**

September 27, 2004

ANNA ROSSI-

RE: KENNETH SIMMONS - 04-CM-740

PLEASE ADVISE <u>IMMEDIATELY</u> WHEN YOU HAVE RECEIVED THE PHOTOGRAPHS & VIDEO TAPE IN THIS MATTER SO WE CAN REVIEW IT.   THIS IS THE CLIENT WHO HAS FILED TO HAVE ME REPLACED & HAS FILED CHARGES IN FEDERAL COURT vs YOUR OFFICE.

THANK YOU.

JACK

1

**JOHN F. LEUCK**
**ATTORNEY AT LAW**
**406 Court Street**
**Pekin, Illinois 61554**
**(309) 353-6046**
**FAX (309) 347-6347**

September 27, 2004

Kenneth W. Simmons
12836 Appenzeller Road
Mackinaw, IL 61755

RE:  Tazewell County Case No. 04-CM-740

Dear Mr. Simmons:

Enclosed is an ORDER entered August 25, 2004, reflecting this matter is scheduled for a Jury Trial in Courtroom 104 of the Tazewell County Courthouse at 9:00 AM on **NOVEMBER 11, 2004.**

I am in receipt of your MOTION TO DISMISS ATTORNEY OF RECORD. In order to proceed with your Motion you must schedule a date when it will be heard and notify all Parties of the time and date the hearing will take place.

I have requested discovery from the State's Attorney including copies of the video and any photos they may have available.   Their response was that the video and photos are in the possession of the Mackinaw Police Department, and when received will be made available for viewing.  To date they have NOT been received from the Mackinaw Police Department. I will notify you immediately when they are available.

As concerns the communication problem, you were sent a letter to the above address on July 21, 2004, advising I would be your Court appointed Public Defender, and you were to contact me to schedule an appointment prior to any Court proceeding.   To date you have NEVER contacted me, other than the one time we were in Court, and you have NO phone so I cannot call you. Your failure to contact me in response to my previous letter lead me to believe any future request would also be ignored, as the initial letter clearly set forth my NAME, ADDRESS, and PHONE NUMBER where I could be reached.

So long as you were aware your Court date was November 11, 2004, the improper date in my previous letter should have no

adverse bearing on this matter, and in fact caused you no inconvenience.

I can be reached at (309) 353-6046 if you have any questions you want to discuss.

Sincerely,

JOHN F. LEUCK

JFL/klm
Enc.

3

**E-FILED**
Tuesday, 02 September, 2008  02:38:59 PM
Clerk, U.S. District Court, ILCD

# Exhibit R

**TAZEWELL COUNTY ANIMAL & RABIES CONTROL**
21314 Illinois Route 9
P.O. Box 158
Tremont, Illinois 61568
925-3370  477-2270  694-6287
**CITIZENS COMPLAINT REPORT FOR ADMINASTATIVE HEARING**

**COMPLAINING PERSON:**
NAME: _Ken  Simmons_    DATE OF BIRTH: _9 - 7. 63_
HOME ADDRESS: _12836  Appen zcller  Ro._ MACKINAW 6175
HOME TELEPHONE: _309 - 635 - 9697_
BUSINESS ADDRESS: _N/A_
BUSINESS TELEPHONE: _____

Are you a friend, neighbor, or relative of potential defendant? (Yes) No
If "Yes", please indicate your relationship. _BROTHER - iN - LAW_

**POTENTIAL DEFENDANT:**
NAME: _ROBERT "BOB" STOCKSTILL_ DATE OF BIRTH: _N/A_
HOME ADDRESS: _ZIM MURLY  RO._
HOME TELEPHONE: _309- 359- 4076_ BUSINESS PHONE: _N/A_

**OFFENSE:**
What charge/s do you want filed? _- Animal Cruelty-_
When did the offense happen?  Date _UNK_  Time _l_
Describe incident: _On  CASTER  2004,  MY  NEPHEW 4  ARRIVED_
_AT  MY  HOUSE  FOR  AVISIT,  WITH  AUNT  CNERYL <._
_WAYNE "NEPHEW" REQUESTED  I  RELEASE  a  DOG_
_FOR  TO PLAY WITH, I  DID, HE  THEN  TOLD ME_
_HIS  FATHER "BOB" HAD  BEEN  SHOOTING  THEIR_
_New  PUPPIES "PITBULLS" in iTH  A  B.B.  GUN._
_+  TOOK  HIM  TO  HIS  AUNTS  LISA  MY WIFE_
_AND  AUNT  CHERYL.  MONDAY  I  FILED  A COMPLAINT._
(If more space is required, indicate "Over" and use reverse side)
How much of what occurred did you actually see?
_NONE_

Did anyone else see ALL or PART OF what occurred? _____ Yes _X_ No
If "Yes", please list their names. Addresses and phone numbers if possible:
_____

Have you reported this offense to the police? Yes (No)
If "Yes", please list name of officer or individual you talked to. _____

Witnesses: _LISA  SIMMENS  COMPLAINT  FILED_
_AUNT  CHERYL  AND  WAYNE  STOCKSTILL  9VRS OLD_

CC: **DEFENDANT**    SIGNATURE _Ken S_    DATE _4- 13-04_

1

TAZEWELL COUNTY ANIMAL & RABIES CONTROL
21314 Illinois Route 9
P.O. Box 158
Tremont. Illinois 61568
925-3370  477-2270  694-6287
## CITIZENS COMPLAINT REPORT FOR ADMINASTATIVE HEARING

COMPLAINING PERSON:
NAME: Isak Simmons    DATE OF BIRTH: 2-16-63
HOME ADDRESS: 12836 Appenzeller Rd  Mackinaw, IL
HOME TELEPHONE: N/A
BUSINESS ADDRESS: N/A
BUSINESS TELEPHONE: N/A

Are you a friend, neighbor, or relative of potential defendant? (Yes) No
If "Yes", please indicate your relationship. Sister

POTENTIAL DEFENDANT:
NAME: Robert W Stucksh ll    DATE OF BIRTH: 8-11-64
HOME ADDRESS: Zimmerly Rd  Mackinaw, IL
HOME TELEPHONE: 359-6076    BUSINESS PHONE: N/A

OFFENSE:
What charge/s do you want filed? Animal Cruelty
When did the offense happen? Date N/A    Time
Describe incident: On Easter Sunday, my sister Cheryl, my nephew Wayne and my niece Sera came over to visit. Wayne & Sara went outside with my husband Ken. Minutes Later my husband & the Kids came in the house. Ken was mad & told me Wayne told him my brother was shoting the puppies with a B.B. Gun. He left. I questioned Wayne He told me his Dad did indeed Shoot them
(If more space is required, indicate "Over" and use reverse side)
How much of what occurred did you actually see?

Did anyone else see ALL or PART OF what occurred? X Yes _____ No
If "Yes", please list their names. Addresses and phone numbers if possible:
Cheryl Brune,

Have you reported this offense to the police? Yes (No)
If "Yes", please list name of officer or individual you talked to.

Witnesses:

CC: **DEFENDANT**    SIGNATURE Isak R Simmons DATE 4-13-04

2

**LOW COST VACCINE CLINIC**
**DONNA SASSMAN D.V.M.**
**20235 IL. RT. 9**
**PEKIN, IL. 61554**
**(309) 925-2226**

NAME: Lori Stockstill          DATE: 3/6/04

ADDRESS: 13625 Zimmerly Rd  Mackina 617

PHONE: 359-4076    ANIMALS NAME: F / Lucky M

DOG X   CAT____   BREED: mix / mix  COLOR: Brown / Tan

MALE I  FEMALE I  AGE ?/?  SPAYED ?  NEUTERED ?

| SERVICES | CHARGE |
|---|---|
| /yr Rabies x2 | 20 00 |
| D HLP PV Booster x2 | 40 00 |
| | |
| | |
| | |
| | |

TOTAL  60 00
CASH
CHECK  60 00
BALANCE DUE  0

3

**E-FILED**
Tuesday, 02 September, 2008  02:39:07 PM
Clerk, U.S. District Court, ILCD

# Exhibit S

Midstate Collison Repair
7 Smith Drive
Mackinaw, IL 61755
(309) 359-4661

June 25, 2004

Mr. Kenneth Simmons:

This letter is in response to your request on June 17th. Enclosed is a copy of our towing charges
and a copy of the police rotation contract. As far as excessive charges, our rates are the same for
everyone and Tazewell County has a copy of our price list on file. On the date of your tow, I went
back to the shop and got our wrecker to tow your truck instead of using the flatbed. I did this to
prevent any possible damage by dragging it or having to disconnect the shift linkage or drive shaft.
When we get a rotation call, we agree to get the job done. Further more, I think you should
apologize to our Office Mananger, Erin for talking in a rude manner on the phone to her and then
hanging up on her. We all have to do our jobs.

Our law enforcement officers are professionals and always maintain the highest standards and
ethics. In all the years I have worked with them, I have never seen or heard of them being "rights
violators". Their job is to maintain the peace and keep our public safe.

If you still have a problem, please feel free to stop by the shop so we can discuss your concerns in
person.

Pete Kehlert

**E-FILED**
Tuesday, 02 September, 2008  02:39:15 PM
Clerk, U.S. District Court, ILCD

# Exhibit T

| PAGE ( 2 )of ( 3 ) PAGES | MPT. OFC. SIG. | TIME, DATE, DAY OF WK. | DISPATCH/INC. NO. |
|---|---|---|---|
| NARRATIVE (Cont) | R.A. Nortzell | 0900   6/23/04 | 044-04 |

I FOUND SEVERAL LAYING IN THE POST OFFICE, AND ONE STUCK IN FRONT DOOR. "(ATTACHED COPY OF LAWSUIT IS PAPER THAT POSTMASTER GAVE THIS OFFICER)

LATER IN THE DAY, THIS OFFICER WAS STOPPED BY #3 TILLERY WHO STATED THAT KENNETH SIMMONS WAS IN TOWN TODAY HANDING OUT COPIES OF THIS LAWSUIT TO EVERYONE HE COULD. TILLERY STATED "SIMMONS HANDED ME A COPY AND SAID, KEEP THIS OR THROW IT AWAY, I REALLY DON'T CARE" TILLERY ALSO STATED "SOME OTHER PEOPLE TOLD ME HE (SIMMONS) WAS GIVING THEM TO THE PEOPLE IN CARS AS THEY STOPPED AT STOP SIGNS IN THE BUSINESS DIST. AREA"

SEVERAL UNKNOWN PERSONS, DURING THE COURSE OF THE DAY, APPROACHED THIS OFFICER (HARTZELL) AND ASKED THIS OFFICER, "WHAT'S THE DEAL WITH THIS SIMMONS GUY? DID HE GET HURT? WHY IS HE SUING EVERYBODY?" THIS OFFICER ANSWER EVERYONE BY SAYING "NO COMMENT"

MRS. STOCKSTILL, ALSO NAMED IN THE LAWSUIT AND MOTHER-IN-LAW OF SIMMONS, CAME TO THE MACKINAW POLICE DEPT., UPSET AND CRYING, STATING PEOPLE WERE ASKING HER WHAT WAS GOING ON AND WHY HER SON-IN-LAW WAS SUING HER. THIS OFFICER ADVISED MRS. STOCKSTILL NOT TO SAY ANYTHING TO ANYONE ABOUT THIS MATTER.

THIS OFFICER TALKED WITH VILLAGE ATTORNEY MARK MCGRATH ABOUT THIS MATTER, AND MCGRATH ADVISED THIS OFFICER —